ZURCHER, CHIEF OF POLICE OF PALO ALTO, ET AL. *v.*
STANFORD DAILY ET AL.

No. 76–1484.   Argued January 17, 1978—Decided May 31, 1978*

*Together with No. 76–1600, *Bergna, District Attorney of Santa Clara County, et al.* v. *Stanford Daily et al.,* also on certiorari to the same court.

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, POWELL, and REHNQUIST, JJ., joined. POWELL, J., filed a concurring opinion, *post*, p. 568. STEWART, J., filed a dissenting opinion, in which MARSHALL, J., joined, *post*, p. 570. STEVENS, J., filed a dissenting opinion, *post*, p. 577. BRENNAN, J., took no part in the consideration or decision of the cases.

*Robert K. Booth, Jr.,* argued the cause for petitioners in No. 76–1484. With him on the briefs were *Marilyn Norek Taketa, Melville A. Toff,* and *Stephen L. Newton.*

*W. Eric Collins,* Deputy Attorney General of California, argued the cause for petitioners in No. 76–1600. With him on the briefs were *Evelle J. Younger,* Attorney General, *Jack R. Winkler,* Chief Assistant Attorney General, *Edward P. O'Brien,* Assistant Attorney General, *Patrick G. Golden* and *Eugene W. Kaster,* Deputy Attorneys General, *Selby Brown, Jr.,* and *Richard K. Abdalah.*

*Jerome B. Falk, Jr.,* argued the cause for respondents in both cases. With him on the briefs was *Anthony G. Amsterdam.*†

†A brief of *amici curiae* urging reversal was filed for their respective States by *William J. Baxley,* Attorney General of Alabama; *Avrum M.*

MR. JUSTICE WHITE delivered the opinion of the Court.

The terms of the Fourth Amendment, applicable to the States by virtue of the Fourteenth Amendment, are familiar:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

As heretofore understood, the Amendment has not been a barrier to warrants to search property on which there is

*Gross,* Attorney General of Alaska; *Evelle J. Younger,* Attorney General of California, and *W. Eric Collins* and *Dane R. Gillette,* Deputy Attorneys General; *Arthur K. Bolton,* Attorney General of Georgia; *Wayne L. Kidwell,* Attorney General of Idaho; *William J. Scott,* Attorney General of Illinois; *Theodore L. Sendak,* Attorney General of Indiana; *Francis B. Burch,* Attorney General of Maryland; *Francis X. Bellotti,* Attorney General of Massachusetts; *A. F. Summer,* Attorney General of Mississippi; *Paul L. Douglas,* Attorney General of Nebraska; *David H. Souter,* Attorney General of New Hampshire; *Toney Anaya,* Attorney General of New Mexico; *James A. Redden,* Attorney General of Oregon; *Robert P. Kane,* Attorney General of Pennsylvania; *Robert B. Hansen,* Attorney General of Utah; and *Anthony F. Troy,* Attorney General of Virginia. A brief of *amici curiae* urging reversal was filed by *Frank Carrington, Wayne W. Schmidt, Glen R. Murphy, James P. Costello, Robert Smith,* and *Richard F. Mayer* for Americans for Effective Law Enforcement, Inc., et al.

Briefs of *amici curiae* urging affirmance were filed by *Dominic P. Gentile, John E. Ackerman,* and *Joseph Beeler* for the National Association of Criminal Defense Lawyers, Inc.; and by *Lloyd N. Cutler, Dennis M. Flannery, William T. Lake, A. Stephen Hut, Jr., Arthur B. Hanson, James R. Cregan, Erwin G. Krasnow, Richard M. Schmidt, Jr., J. Laurent Scharff, Christopher B. Fager, David S. Barr,* and *Mortimer Becker* for the Reporters Committee for Freedom of the Press et al.

Briefs of *amici curiae* were filed by *Solicitor General McCree, Assistant Attorney General Civiletti, Deputy Solicitor General Frey, Harriet S. Shapiro,* and *Elliot Schulder* for the United States; and by *Edwin L. Miller, Jr., Richard D. Huffman,* and *Peter C. Lehman* for the National District Attorneys Assn. et al.

probable cause to believe that fruits, instrumentalities, or evidence of crime is located, whether or not the owner or possessor of the premises to be searched is himself reasonably suspected of complicity in the crime being investigated. We are now asked to reconstrue the Fourth Amendment and to hold for the first time that when the place to be searched is occupied by a person not then a suspect, a warrant to search for criminal objects and evidence reasonably believed to be located there should not issue except in the most unusual circumstances, and that except in such circumstances, a subpoena *duces tecum* must be relied upon to recover the objects or evidence sought.

I

Late in the day on Friday, April 9, 1971, officers of the Palo Alto Police Department and of the Santa Clara County Sheriff's Department responded to a call from the director of the Stanford University Hospital requesting the removal of a large group of demonstrators who had seized the hospital's administrative offices and occupied them since the previous afternoon. After several futile efforts to persuade the demonstrators to leave peacefully, more drastic measures were employed. The demonstrators had barricaded the doors at both ends of a hall adjacent to the administrative offices. The police chose to force their way in at the west end of the corridor. As they did so, a group of demonstrators emerged through the doors at the east end and, armed with sticks and clubs, attacked the group of nine police officers stationed there. One officer was knocked to the floor and struck repeatedly on the head; another suffered a broken shoulder. All nine were injured.[1] There were no police photographers at the east doors, and most bystanders and reporters were on the west side. The officers themselves were able to identify only two of their

---

[1] There was extensive damage to the administrative offices resulting from the occupation and the removal of the demonstrators.

assailants, but one of them did see at least one person photographing the assault at the east doors.

On Sunday, April 11, a special edition of the Stanford Daily (Daily), a student newspaper published at Stanford University, carried articles and photographs devoted to the hospital protest and the violent clash between demonstrators and police. The photographs carried the byline of a Daily staff member and indicated that he had been at the east end of the hospital hallway where he could have photographed the assault on the nine officers. The next day, the Santa Clara County District Attorney's Office secured a warrant from the Municipal Court for an immediate search of the Daily's offices for negatives, film, and pictures showing the events and occurrences at the hospital on the evening of April 9. The warrant issued on a finding of "just, probable and reasonable cause for believing that: Negatives and photographs and films, evidence material and relevant to the identity of the perpetrators of felonies, to wit, Battery on a Peace Officer, and Assault with Deadly Weapon, will be located [on the premises of the Daily]." App. 31–32. The warrant affidavit contained no allegation or indication that members of the Daily staff were in any way involved in unlawful acts at the hospital.

The search pursuant to the warrant was conducted later that day by four police officers and took place in the presence of some members of the Daily staff. The Daily's photographic laboratories, filing cabinets, desks, and wastepaper baskets were searched. Locked drawers and rooms were not opened. The officers apparently had opportunity to read notes and correspondence during the search; but, contrary to claims of the staff, the officers denied that they had exceeded the limits of the warrant.[2] They had not been advised by the staff that the areas they were searching contained confidential materials. The search revealed only the photographs that had already

---

[2] The District Court did not find it necessary to resolve this dispute.

been published on April 11, and no materials were removed from the Daily's office.

A month later the Daily and various members of its staff, respondents here, brought a civil action in the United States District Court for the Northern District of California seeking declaratory and injunctive relief under 42 U. S. C. § 1983 against the police officers who conducted the search, the chief of police, the district attorney and one of his deputies, and the judge who had issued the warrant. The complaint alleged that the search of the Daily's office had deprived respondents under color of state law of rights secured to them by the First, Fourth, and Fourteenth Amendments of the United States Constitution.

The District Court denied the request for an injunction but, on respondents' motion for summary judgment, granted declaratory relief. 353 F. Supp. 124 (1972). The court did not question the existence of probable cause to believe that a crime had been committed and to believe that relevant evidence would be found on the Daily's premises. It held, however, that the Fourth and Fourteenth Amendments forbade the issuance of a warrant to search for materials in possession of one not suspected of crime unless there is probable cause to believe, based on facts presented in a sworn affidavit, that a subpoena *duces tecum* would be impracticable. Moreover, the failure to honor a subpoena would not alone justify a warrant; it must also appear that the possessor of the objects sought would disregard a court order not to remove or destroy them. The District Court further held that where the innocent object of the search is a newspaper, First Amendment interests are also involved and that such a search is constitutionally permissible "only in the rare circumstance where there is a *clear showing* that (1) important materials will be destroyed or removed from the jurisdiction; *and* (2) a restraining order would be futile." *Id.*, at 135. Since these preconditions to a valid warrant had not been satisfied here,

the search of the Daily's offices was declared to have been illegal. The Court of Appeals affirmed *per curiam,* adopting the opinion of the District Court. 550 F. 2d 464 (CA9 1977).[3] We issued the writs of certiorari requested by petitioners. 434 U. S. 816 (1977).[4] We reverse.

## II

The issue here is how the Fourth Amendment is to be construed and applied to the "third party" search, the recurring situation where state authorities have probable cause to believe that fruits, instrumentalities, or other evidence of crime is located on identified property but do not then have probable cause to believe that the owner or possessor of the property is himself implicated in the crime that has occurred or is occurring. Because under the District Court's rule impracticability can be shown only by furnishing facts demonstrating that the third party will not only disobey the subpoena but also ignore a restraining order not to move or destroy the property, it is apparent that only in unusual situations could the State satisfy such a severe burden and that for all practical purposes the effect of the rule is that fruits, instrumentalities, and evidence of crime may be recovered from third parties only by subpoena, not by search warrant. At least, we assume that the District Court did not intend its rule to be toothless and anticipated that only subpoenas would be available in many cases where without the rule a search warrant would issue.

---

[3] The Court of Appeals also approved the award of attorney's fees to respondents pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, 42 U. S. C. § 1988 (1976 ed.). We do not consider the propriety of this award in light of our disposition on the merits reversing the judgment upon which the award was predicated.

[4] Petitioners in No. 76–1484 are the chief of police and the officers under his command who conducted the search. Petitioners in No. 76–1600 are the district attorney and a deputy district attorney who participated in the obtaining of the search warrant. The action against the judge who issued the warrant was subsequently dismissed upon the motion of respondents.

It is an understatement to say that there is no direct authority in this or any other federal court for the District Court's sweeping revision of the Fourth Amendment.[5] Under existing law, valid warrants may be issued to search *any* property, whether or not occupied by a third party, at which there is probable cause to believe that fruits, instrumentalities, or evidence of a crime will be found. Nothing on the face of the Amendment suggests that a third-party search warrant should not normally issue. The Warrant Clause speaks of search warrants issued on "probable cause" and "particularly describing the place to be searched, and the persons or things to be seized." In situations where the State does not seek to seize "persons" but only those "things" which there is probable cause to believe are located on the place to be searched, there is no apparent basis in the language of the Amendment for also imposing the requirements for a valid arrest—probable cause to believe that the third party is implicated in the crime.

As the Fourth Amendment has been construed and applied by this Court, "when the State's reason to believe incriminating evidence will be found becomes sufficiently great, the invasion of privacy becomes justified and a warrant to search and seize will issue." *Fisher* v. *United States,* 425 U. S. 391, 400 (1976). In *Camara* v. *Municipal Court,* 387 U. S. 523, 534–535 (1967), we indicated that in applying the "probable cause" standard "by which a particular decision to search is

---

[5] Respondents rely on four state cases to support the holding that a warrant may not issue unless it is shown that a subpoena is impracticable: *Owens* v. *Way,* 141 Ga. 796, 82 S. E. 132 (1914); *Newberry* v. *Carpenter,* 107 Mich. 567, 65 N. W. 530 (1895); *People* v. *Carver,* 172 Misc. 820, 16 N. Y. S. 2d 268 (County Ct. 1939); and *Commodity Mfg. Co.* v. *Moore,* 198 N. Y. S. 45 (Sup. Ct. 1923). None of these cases, however, stands for the proposition arrived at by the District Court and urged by respondents. The District Court also drew upon *Bacon* v. *United States,* 449 F. 2d 933 (CA9 1971), but that case dealt with arrest of a material witness and is unpersuasive with respect to the search for criminal evidence.

tested against the constitutional mandate of reasonableness," it is necessary "to focus upon the governmental interest which allegedly justifies official intrusion" and that in criminal investigations a warrant to search for recoverable items is reasonable "only when there is 'probable cause' to believe that they will be uncovered in a particular dwelling." Search warrants are not directed at persons; they authorize the search of "place[s]" and the seizure of "things," and as a constitutional matter they need not even name the person from whom the things will be seized. *United States* v. *Kahn,* 415 U. S. 143, 155 n. 15 (1974).

Because the State's interest in enforcing the criminal law and recovering evidence is the same whether the third party is culpable or not, the premise of the District Court's holding appears to be that state entitlement to a search warrant depends on the culpability of the owner or possessor of the place to be searched and on the State's right to arrest him. The cases are to the contrary. Prior to *Camara* v. *Municipal Court, supra,* and *See* v. *Seattle,* 387 U. S. 541 (1967), the central purpose of the Fourth Amendment was seen to be the protection of the individual against official searches for evidence to convict him of a crime. Entries upon property for civil purposes, where the occupant was suspected of no criminal conduct whatsoever, involved a more peripheral concern and the less intense "right to be secure from intrusion into personal privacy." *Frank* v. *Maryland,* 359 U. S. 360, 365 (1959); *Camara* v. *Municipal Court, supra,* at 530. Such searches could proceed without warrant, as long as the State's interest was sufficiently substantial. Under this view, the Fourth Amendment was *more* protective where the place to be searched was occupied by one suspected of crime and the search was for evidence to use against him. *Camara* and *See,* disagreeing with *Frank* to this extent, held that a warrant *is* required where entry is sought for *civil* purposes, as well as when criminal law enforcement is involved. Neither

case, however, suggested that to secure a search warrant the owner or occupant of the place to be inspected or searched must be suspected of criminal involvement. Indeed, both cases held that a less stringent standard of probable cause is acceptable where the entry is not to secure evidence of crime against the possessor.

We have suggested nothing to the contrary since *Camara* and *See*. Indeed, *Colonnade Catering Corp.* v. *United States*, 397 U. S. 72 (1970), and *United States* v. *Biswell*, 406 U. S. 311 (1972), dispensed with the warrant requirement in cases involving limited types of inspections and searches.

The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific "things" to be searched for and seized are located on the property to which entry is sought.[6]  In *Carroll* v. *United States*, 267 U. S. 132

---

[6] The same view has been expressed by those who have given close attention to the Fourth Amendment. "It does not follow, however, that probable cause for arrest would justify the issuance of a search warrant, or, on the other hand, that probable cause for a search warrant would necessarily justify an arrest.  Each requires probabilities as to somewhat different facts and circumstances—a point which is seldom made explicit in the appellate cases. . . .

"This means, for one thing, that while probable cause for arrest requires information justifying a reasonable belief that a crime has been committed and that a particular person committed it, a search warrant may be issued on a complaint which does not identify any particular person as the likely offender.  Because the complaint for a search warrant is not 'filed as the basis of a criminal prosecution,' it need not identify the person in charge of the premises or name the person in possession or any other person as the offender."  LaFave, Search and Seizure: "The Course of True Law . . . Has Not . . . Run Smooth," U. Ill. Law Forum 255, 260–261 (1966) (footnotes omitted).

"Furthermore, a warrant may issue to search the premises of anyone, without any showing that the occupant is guilty of any offense whatever." T. Taylor, Two Studies in Constitutional Interpretation 48–49 (1969). "Search warrants may be issued only by a neutral and detached judicial officer, upon a showing of probable cause—that is, reasonable grounds to

(1925), it was claimed that the seizure of liquor was unconstitutional because the occupant of a car stopped with probable cause to believe that it was carrying illegal liquor was not subject to arrest. The Court, however, said:

> "If their theory were sound, their conclusion would be. The validity of the seizure then would turn wholly on the validity of the arrest without a seizure. But the theory is unsound. The right to search and the validity of the seizure are not dependent on the right to arrest. They are dependent on the reasonable cause the seizing officer has for belief that the contents of the automobile offend against the law." *Id.,* at 158–159.

The Court's ultimate conclusion was that "the officers here had justification for the search and seizure," that is, a reasonable "belief that intoxicating liquor was being transported in the automobile which they stopped and searched." *Id.,* at 162. See also *Husty* v. *United States,* 282 U. S. 694, 700–701 (1931).

---

believe—that criminally related objects are in the place which the warrant authorizes to be searched, at the time when the search is authorized to be conducted." Amsterdam, Perspectives on the Fourth Amendment, 58 Minn. L. Rev. 349, 358 (1974) (footnotes omitted).

"Two conclusions necessary to the issuance of the warrant must be supported by substantial evidence: that the items sought are in fact seizable by virtue of being connected with criminal activity, and that the items will be found in the place to be searched. By comparison, the right of arrest arises only when a crime is committed or attempted in the presence of the arresting officer or when the officer has 'reasonable grounds to believe'—sometimes stated 'probable cause to believe'—that a felony has been committed by the person to be arrested. Although it would appear that the conclusions which justify either arrest or the issuance of a search warrant must be supported by evidence of the same degree of probity, it is clear that the conclusions themselves are not identical.

"In the case of arrest, the conclusion concerns the guilt of the arrestee, whereas in the case of search warrants, the conclusions go to the connection of the items sought with crime and to their present location." Comment, 28 U. Chi. L. Rev. 664, 687 (1961) (footnotes omitted).

Federal Rule Crim. Proc. 41, which reflects "[t]he Fourth Amendment's policy against unreasonable searches and seizures," *United States* v. *Ventresca,* 380 U. S. 102, 105 n. 1 (1965), authorizes warrants to search for contraband, fruits or instrumentalities of crime, or "any . . . property that constitutes evidence of the commission of a criminal offense . . . ." Upon proper showing, the warrant is to issue "identifying the property and naming or describing the person or place to be searched." Probable cause for the warrant must be presented, but there is nothing in the Rule indicating that the officers must be entitled to arrest the owner of the "place" to be searched before a search warrant may issue and the "property" may be searched for and seized. The Rule deals with warrants to search, and is unrelated to arrests. Nor is there anything in the Fourth Amendment indicating that absent probable cause to arrest a third party, resort must be had to a subpoena.[7]

The Court of Appeals for the Sixth Circuit expressed the correct view of Rule 41 and of the Fourth Amendment when, contrary to the decisions of the Court of Appeals and the District Court in the present litigation, it ruled that "[o]nce it is established that probable cause exists to believe a federal crime has been committed a warrant may issue for the search of any property which the magistrate has probable cause to believe may be the place of concealment of evidence of the crime." *United States* v. *Manufacturers Nat. Bank of Detroit,* 536 F. 2d 699, 703 (1976), cert. denied *sub nom. Wingate* v. *United States,* 429 U. S. 1039 (1977). Accord, *State* v. *Tunnel Citgo Services,* 149 N. J. Super. 427, 433, 374 A. 2d 32, 35 (1977).

The net of the matter is that "[s]earches and seizures, in a

---

[7] Petitioners assert that third-party searches have long been authorized under Cal. Penal Code Ann. § 1524 (West 1970), which provides that fruits, instrumentalities, and evidence of crime "may be taken on the warrant from any place, or from any person in whose possession [they] may be." The District Court did not advert to this provision.

technical sense, are independent of, rather than ancillary to, arrest and arraignment." ALI, A Model Code of Pre-Arraignment Procedure, Commentary 491 (Proposed Off. Draft 1975). The Model Code provides that the warrant application "shall describe with particularity the individuals or places to be searched and the individuals or things to be seized, and shall be supported by one or more affidavits particularly setting forth the facts and circumstances tending to show that such individuals or things are or will be in the places, or the things are or will be in possession of the individuals, to be searched." § SS 220.1 (3). There is no suggestion that the occupant of the place to be searched must himself be implicated in misconduct.

Against this background, it is untenable to conclude that property may not be searched unless its occupant is reasonably suspected of crime and is subject to arrest. And if those considered free of criminal involvement may nevertheless be searched or inspected under civil statutes, it is difficult to understand why the Fourth Amendment would prevent entry onto their property to recover evidence of a crime not committed by them but by others. As we understand the structure and language of the Fourth Amendment and our cases expounding it, valid warrants to search property may be issued when it is satisfactorily demonstrated to the magistrate that fruits, instrumentalities, or evidence of crime is located on the premises. The Fourth Amendment has itself struck the balance between privacy and public need, and there is no occasion or justification for a court to revise the Amendment and strike a new balance by denying the search warrant in the circumstances present here and by insisting that the investigation proceed by subpoena *duces tecum*, whether on the theory that the latter is a less intrusive alternative or otherwise.

This is not to question that "reasonableness" is the overriding test of compliance with the Fourth Amendment or to assert that searches, however or whenever executed, may never

be unreasonable if supported by a warrant issued on probable cause and properly identifying the place to be searched and the property to be seized. We do hold, however, that the courts may not, in the name of Fourth Amendment reasonableness, prohibit the States from issuing warrants to search for evidence simply because the owner or possessor of the place to be searched is not then reasonably suspected of criminal involvement.

## III

In any event, the reasons presented by the District Court and adopted by the Court of Appeals for arriving at its remarkable conclusion do not withstand analysis. First, as we have said, it is apparent that whether the third-party occupant is suspect or not, the State's interest in enforcing the criminal law and recovering the evidence remains the same; and it is the seeming innocence of the property owner that the District Court relied on to foreclose the warrant to search. But, as respondents themselves now concede, if the third party knows that contraband or other illegal materials are on his property, he is sufficiently culpable to justify the issuance of a search warrant. Similarly, if his ethical stance is the determining factor, it seems to us that whether or not he knows that the sought-after articles are secreted on his property and whether or not he knows that the articles are in fact the fruits, instrumentalities, or evidence of crime, he will be so informed when the search warrant is served, and it is doubtful that he should then be permitted to object to the search, to withhold, if it is there, the evidence of crime reasonably believed to be possessed by him or secreted on his property, and to forbid the search and insist that the officers serve him with a subpoena *duces tecum*.

Second, we are unpersuaded that the District Court's new rule denying search warrants against third parties and insisting on subpoenas would substantially further privacy interests without seriously undermining law enforcement efforts. Because of the fundamental public interest in implementing

the criminal law, the search warrant, a heretofore effective and constitutionally acceptable enforcement tool, should not be suppressed on the basis of surmise and without solid evidence supporting the change. As the District Court understands it, denying third-party search warrants would not have substantial adverse effects on criminal investigations because the nonsuspect third party, once served with a subpoena, will preserve the evidence and ultimately lawfully respond. The difficulty with this assumption is that search warrants are often employed early in an investigation, perhaps before the identity of any likely criminal and certainly before all the perpetrators are or could be known. The seemingly blameless third party in possession of the fruits or evidence may not be innocent at all; and if he is, he may nevertheless be so related to or so sympathetic with the culpable that he cannot be relied upon to retain and preserve the articles that may implicate his friends, or at least not to notify those who would be damaged by the evidence that the authorities are aware of its location. In any event, it is likely that the real culprits will have access to the property, and the delay involved in employing the subpoena *duces tecum,* offering as it does the opportunity to litigate its validity, could easily result in the disappearance of the evidence, whatever the good faith of the third party.

Forbidding the warrant and insisting on the subpoena instead when the custodian of the object of the search is not then suspected of crime, involves hazards to criminal investigation much more serious than the District Court believed; and the record is barren of anything but the District Court's assumptions to support its conclusions.[8]    At the very least, the

---

[8] It is also far from clear, even apart from the dangers of destruction and removal, whether the use of the subpoena *duces tecum* under circumstances where there is probable cause to believe that a crime has been committed and that the materials sought constitute evidence of its commission will result in the production of evidence with sufficient regularity to satisfy the public interest in law enforcement. Unlike the individual whose privacy is invaded by a search, the recipient of a subpoena may assert the Fifth

burden of justifying a major revision of the Fourth Amendment has not been carried.

We are also not convinced that the net gain to privacy interests by the District Court's new rule would be worth the candle.[9]  In the normal course of events, search warrants are

___

Amendment privilege against self-incrimination in response to a summons to produce evidence or give testimony.  See *Maness* v. *Meyers*, 419 U. S. 449 (1975).  This privilege is not restricted to suspects.  We have construed it broadly as covering any individual who might be incriminated by the evidence in connection with which the privilege is asserted.  *Hoffman* v. *United States*, 341 U. S. 479 (1951).  The burden of overcoming an assertion of the Fifth Amendment privilege, even if prompted by a desire not to cooperate rather than any real fear of self-incrimination, is one which prosecutors would rarely be able to meet in the early stages of an investigation despite the fact they did not regard the witness as a suspect.  Even time spent litigating such matters could seriously impede criminal investigations.

[9] We reject totally the reasoning of the District Court that additional protections are required to assure that the Fourth Amendment rights of third parties are not violated because of the unavailability of the exclusionary rule as a deterrent to improper searches of premises in the control of nonsuspects.  353 F. Supp. 124, 131–132 (1972).  In *Alderman* v. *United States*, 394 U. S. 165 (1969), we expressly ruled that suppression of the fruits of a Fourth Amendment violation may be urged only by those whose rights were infringed by the search itself and not by those aggrieved solely by the introduction of incriminating evidence.  The predicate for this holding was that the additional deterrent effect of permitting defendants whose Fourth Amendment rights had not been violated to challenge infringements of the privacy interests of others did not "justify further encroachment upon the public interest in prosecuting those accused of crime and having them acquitted or convicted on the basis of all the evidence which exposes the truth." *Id.*, at 175.  For similar reasons, we conclude that the interest in deterring illegal third-party searches does not justify a rule such as that adopted by the District Court.  It is probably seldom that police during the investigatory stage when most searches occur will be so convinced that no potential defendant will have standing to exclude evidence on Fourth Amendment grounds that they will feel free to ignore constitutional restraints.  In any event, it would be placing the cart before the horse to prohibit searches otherwise conforming to the Fourth Amendment because of a perception that the deterrence provided by the

more difficult to obtain than subpoenas, since the latter do not involve the judiciary and do not require proof of probable cause. Where, in the real world, subpoenas would suffice, it can be expected that they will be employed by the rational prosecutor. On the other hand, when choice is available under local law and the prosecutor chooses to use the search warrant, it is unlikely that he has needlessly selected the more difficult course. His choice is more likely to be based on the solid belief, arrived at through experience but difficult, if not impossible, to sustain in a specific case, that the warranted search is necessary to secure and to avoid the destruction of evidence.[10]

## IV

The District Court held, and respondents assert here, that whatever may be true of third-party searches generally, where the third party is a newspaper, there are additional factors derived from the First Amendment that justify a nearly *per se* rule forbidding the search warrant and permitting only the subpoena *duces tecum*. The general submission is that searches of newspaper offices for evidence of crime reasonably believed to be on the premises will seriously threaten the ability of the press to gather, analyze, and disseminate news. This is said to be true for several reasons: First, searches will be physically disruptive to such an extent that timely publication will be impeded. Second, confidential sources of infor-

---

existing rules of standing is insufficient to discourage illegal searches. Cf. *Warden* v. *Hayden,* 387 U. S. 294, 309 (1967). Finally, the District Court overlooked the fact that the California Supreme Court has ruled as a matter of state law that the legality of a search and seizure may be challenged by anyone against whom evidence thus obtained is used. *Kaplan* v. *Superior Court,* 6 Cal. 3d 150, 491 P. 2d 1 (1971).

[10] Petitioners assert that the District Court ignored the realities of California law and practice that are said to preclude or make very difficult the use of subpoenas as investigatory techniques. If true, the choice of procedures may not always be open to the diligent prosecutor in the State of California.

mation will dry up, and the press will also lose opportunities to cover various events because of fears of the participants that press files will be readily available to the authorities. Third, reporters will be deterred from recording and preserving their recollections for future use if such information is subject to seizure. Fourth, the processing of news and its dissemination will be chilled by the prospects that searches will disclose internal editorial deliberations. Fifth, the press will resort to self-censorship to conceal its possession of information of potential interest to the police.

It is true that the struggle from which the Fourth Amendment emerged "is largely a history of conflict between the Crown and the press," *Stanford* v. *Texas,* 379 U. S. 476, 482 (1965), and that in issuing warrants and determining the reasonableness of a search, state and federal magistrates should be aware that "unrestricted power of search and seizure could also be an instrument for stifling liberty of expression." *Marcus* v. *Search Warrant,* 367 U. S. 717, 729 (1961). Where the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with "scrupulous exactitude." *Stanford* v. *Texas, supra,* at 485. "A seizure reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material." *Roaden* v. *Kentucky,* 413 U. S. 496, 501 (1973). Hence, in *Stanford* v. *Texas,* the Court invalidated a warrant authorizing the search of a private home for all books, records, and other materials relating to the Communist Party, on the ground that whether or not the warrant would have been sufficient in other contexts, it authorized the searchers to rummage among and make judgments about books and papers and was the functional equivalent of a general warrant, one of the principal targets of the Fourth Amendment. Where presumptively protected materials are sought to be seized, the warrant requirement should be administered to leave as little as possible to the discretion or whim of the officer in the field.

Similarly, where seizure is sought of allegedly obscene materials, the judgment of the arresting officer alone is insufficient to justify issuance of a search warrant or a seizure without a warrant incident to arrest. The procedure for determining probable cause must afford an opportunity for the judicial officer to "focus searchingly on the question of obscenity." *Marcus* v. *Search Warrant, supra,* at 732; *A Quantity of Books* v. *Kansas,* 378 U. S. 205, 210 (1964); *Lee Art Theatre, Inc.* v. *Virginia,* 392 U. S. 636, 637 (1968); *Roaden* v. *Kentucky, supra,* at 502; *Heller* v. *New York,* 413 U. S. 483, 489 (1973).

Neither the Fourth Amendment nor the cases requiring consideration of First Amendment values in issuing search warrants, however, call for imposing the regime ordered by the District Court. Aware of the long struggle between Crown and press and desiring to curb unjustified official intrusions, the Framers took the enormously important step of subjecting searches to the test of reasonableness and to the general rule requiring search warrants issued by neutral magistrates. They nevertheless did not forbid warrants where the press was involved, did not require special showings that subpoenas would be impractical, and did not insist that the owner of the place to be searched, if connected with the press, must be shown to be implicated in the offense being investigated. Further, the prior cases do no more than insist that the courts apply the warrant requirements with particular exactitude when First Amendment interests would be endangered by the search. As we see it, no more than this is required where the warrant requested is for the seizure of criminal evidence reasonably believed to be on the premises occupied by a newspaper. Properly administered, the preconditions for a warrant—probable cause, specificity with respect to the place to be searched and the things to be seized, and overall reasonableness—should afford sufficient protection against the harms that are assertedly threatened by warrants for searching newspaper offices.

There is no reason to believe, for example, that magistrates cannot guard against searches of the type, scope, and intrusiveness that would actually interfere with the timely publication of a newspaper. Nor, if the requirements of specificity and reasonableness are properly applied, policed, and observed, will there be any occasion or opportunity for officers to rummage at large in newspaper files or to intrude into or to deter normal editorial and publication decisions. The warrant issued in this case authorized nothing of this sort. Nor are we convinced, any more than we were in *Branzburg* v. *Hayes,* 408 U. S. 665 (1972), that confidential sources will disappear and that the press will suppress news because of fears of warranted searches. Whatever incremental effect there may be in this regard if search warrants, as well as subpoenas, are permissible in proper circumstances, it does not make a constitutional difference in our judgment.

The fact is that respondents and *amici* have pointed to only a very few instances in the entire United States since 1971 involving the issuance of warrants for searching newspaper premises. This reality hardly suggests abuse; and if abuse occurs, there will be time enough to deal with it. Furthermore, the press is not only an important, critical, and valuable asset to society, but it is not easily intimidated—nor should it be.

Respondents also insist that the press should be afforded opportunity to litigate the State's entitlement to the material it seeks before it is turned over or seized and that whereas the search warrant procedure is defective in this respect, resort to the subpoena would solve the problem. The Court has held that a restraining order imposing a prior restraint upon free expression is invalid for want of notice and opportunity for a hearing, *Carroll* v. *Princess Anne,* 393 U. S. 175 (1968), and that seizures not merely for use as evidence but entirely removing arguably protected materials from circulation may be effected only after an adversary hearing and a judicial

finding of obscenity. *A Quantity of Books* v. *Kansas, supra.*
But presumptively protected materials are not necessarily
immune from seizure under warrant for use at a criminal trial.
Not every such seizure, and not even most, will impose a prior
restraint. *Heller* v. *New York, supra.* And surely a warrant
to search newspaper premises for criminal evidence such as the
one issued here for news photographs taken in a public place
carries no realistic threat of prior restraint or of any direct
restraint whatsoever on the publication of the Daily or on its
communication of ideas. The hazards of such warrants can
be avoided by a neutral magistrate carrying out his responsi-
bilities under the Fourth Amendment, for he has ample tools
at his disposal to confine warrants to search within reasonable
limits.

We note finally that if the evidence sought by warrant
is sufficiently connected with the crime to satisfy the probable-
cause requirement, it will very likely be sufficiently relevant to
justify a subpoena and to withstand a motion to quash. Fur-
ther, Fifth Amendment and state shield-law objections that
might be asserted in opposition to compliance with a sub-
poena are largely irrelevant to determining the legality of a
search warrant under the Fourth Amendment. Of course,
the Fourth Amendment does not prevent or advise against
legislative or executive efforts to establish nonconstitutional
protections against possible abuses of the search warrant pro-
cedure, but we decline to reinterpret the Amendment to impose
a general constitutional barrier against warrants to search
newspaper premises, to require resort to subpoenas as a
general rule, or to demand prior notice and hearing in connec-
tion with the issuance of search warrants.

V

We accordingly reject the reasons given by the District
Court and adopted by the Court of Appeals for holding the
search for photographs at the Stanford Daily to have been

unreasonable within the meaning of the Fourth Amendment and in violation of the First Amendment. Nor has anything else presented here persuaded us that the Amendments forbade this search. It follows that the judgment of the Court of Appeals is reversed.

*So ordered.*

MR. JUSTICE BRENNAN took no part in the consideration or decision of these cases.

MR. JUSTICE POWELL, concurring.

I join the opinion of the Court, and I write simply to emphasize what I take to be the fundamental error of MR. JUSTICE STEWART's dissenting opinion. As I understand that opinion, it would read into the Fourth Amendment, as a new and *per se* exception, the rule that any search of an entity protected by the Press Clause of the First Amendment is unreasonable so long as a subpoena could be used as a substitute procedure. Even aside from the difficulties involved in deciding on a case-by-case basis whether a subpoena can serve as an adequate substitute,[1] I agree with the Court that there is no constitutional basis for such a reading.

---

[1] For example, respondents had announced a policy of destroying any photographs that might aid prosecution of protesters. App. 118, 152–153. While this policy probably reflected the deep feelings of the Vietnam era, and one may assume that under normal circumstances few, if any, press entities would adopt a policy so hostile to law enforcement, respondents' policy at least illustrates the possibility of such hostility. Use of a subpoena, as proposed by the dissent, would be of no utility in face of a policy of destroying evidence. And unless the policy were publicly announced, it probably would be difficult to show the impracticality of a subpoena as opposed to a search warrant.

At oral argument, counsel for respondents stated that the announced policy of the Stanford Daily conceivably could have extended to the destruction of evidence of *any* crime:

"QUESTION: Let us assume you had a picture of the commission of a crime. For example, in banks they take pictures regularly of, not only

If the Framers had believed that the press was entitled to a special procedure, not available to others, when government authorities required evidence in its possession, one would have expected the terms of the Fourth Amendment to reflect that belief. As the opinion of the Court points out, the struggle from which the Fourth Amendment emerged was that between Crown and press. *Ante,* at 564. The Framers were painfully aware of that history, and their response to it was the Fourth Amendment. *Ante,* at 565. Hence, there is every reason to believe that the usual procedures contemplated by the Fourth Amendment do indeed apply to the press, as to every other person.

This is not to say that a warrant which would be sufficient to support the search of an apartment or an automobile necessarily would be reasonable in supporting the search of a

---

of robbery but of murder committed in a bank and there have been pictures taken of the actual pulling of the trigger or the pointing of the gun and pulling of the trigger. There is a very famous one related to the assassination of President Kennedy.

"What would the policy of the *Stanford Daily* be with respect to that? Would it feel free to destroy it at any time before a subpoena had been served?

"MR. FALK: The—literally read, the policy of the *Daily* requires me to give an affirmative answer. I find it hard to believe that in an example such as that, that the policy would have been carried out. It was not addressed to a picture of that kind or in that context.

"QUESTION: Well, I am sure you were right. I was just getting to the scope of your theory.

"MR. FALK: Our—

"QUESTION: What is the difference between the pictures Justice Powell just described and the pictures they were thought to have?

"MR. FALK: ·Well, it simply is a distinction that—

"QUESTION: Attacking police officers instead of the President. That is the only difference." Tr. of Oral Arg. 39–40.

While the existence of this policy was not before the magistrate at the time of the warrant's issuance, 353 F. Supp. 124, 135 n. 16 (ND Cal. 1972), it illustrates the possible dangers of creating separate standards for the press alone.

newspaper office. As the Court's opinion makes clear, *ante,* at 564–565, the magistrate must judge the reasonableness of every warrant in light of the circumstances of the particular case, carefully considering the description of the evidence sought, the situation of the premises, and the position and interests of the owner or occupant. While there is no justification for the establishment of a separate Fourth Amendment procedure for the press, a magistrate asked to issue a warrant for the search of press offices can and should take cognizance of the independent values protected by the First Amendment— such as those highlighted by MR. JUSTICE STEWART—when he weighs such factors. If the reasonableness and particularity requirements are thus applied, the dangers are likely to be minimal.[2] *Ibid.*

In any event, considerations such as these are the province of the Fourth Amendment. There is no authority either in history or in the Constitution itself for exempting certain classes of persons or entities from its reach.[3]

MR. JUSTICE STEWART, with whom MR. JUSTICE MARSHALL joins, dissenting.

Believing that the search by the police of the offices of the

[2] Similarly, the magnitude of a proposed search directed at *any* third party and the nature and significance of the material sought are factors properly considered as bearing on the reasonableness and particularity requirements. Moreover, there is no reason why police officers executing a warrant should not seek the cooperation of the subject party, in order to prevent needless disruption.

[3] The concurring opinion in *Branzburg* v. *Hayes,* 408 U. S. 665, 709–710 (1972) (POWELL, J.), does not support the view that the Fourth Amendment contains an implied exception for the press, through the operation of the First Amendment. That opinion noted only that in considering a motion to quash a subpoena directed to a newsman, the court should balance the competing values of a free press and the societal interest in detecting and prosecuting crime. The concurrence expressed no doubt as to the applicability of the subpoena procedure to members of the press. Rather than advocating the creation of a special procedural exception for

Stanford Daily infringed the First and Fourteenth Amendments' guarantee of a free press, I respectfully dissent.[1]

## I

It seems to me self-evident that police searches of newspaper offices burden the freedom of the press. The most immediate and obvious First Amendment injury caused by such a visitation by the police is physical disruption of the operation of the newspaper. Policemen occupying a newsroom and searching it thoroughly for what may be an extended period of time [2] will inevitably interrupt its normal operations, and thus impair or even temporarily prevent the processes of newsgathering, writing, editing, and publishing. By contrast, a subpoena would afford the newspaper itself an opportunity to locate whatever material might be requested and produce it.

But there is another and more serious burden on a free press imposed by an unannounced police search of a newspaper office: the possibility of disclosure of information received from confidential sources, or of the identity of the sources themselves. Protection of those sources is necessary to ensure that

---

the press, it approved recognition of First Amendment concerns within the applicable procedure. The concurring opinion may, however, properly be read as supporting the view expressed in the text above, and in the Court's opinion, that under the warrant requirement of the Fourth Amendment, the magistrate should consider the values of a free press as well as the societal interest in enforcing the criminal laws.

[1] I agree with the Court that the *Fourth* Amendment does not forbid the issuance of search warrants "simply because the owner or possessor of the place to be searched is not then reasonably suspected of criminal involvement." *Ante,* at 560. Thus, contrary to the understanding expressed in the concurring opinion, I do not "read" anything "into the Fourth Amendment." *Ante,* at 568. Instead, I would simply enforce the provisions of the *First* Amendment.

[2] One search of a radio station in Los Angeles lasted over eight hours. Note, Search and Seizure of the Media: A Statutory, Fourth Amendment and First Amendment Analysis, 28 Stan. L. Rev. 957, 957–959 (1976).

the press can fulfill its constitutionally designated function of informing the public,[3] because important information can often be obtained only by an assurance that the source will not be revealed. *Branzburg* v. *Hayes,* 408 U. S. 665, 725–736 (dissenting opinion).[4] And the Court has recognized that " 'without some protection for seeking out the news, freedom of the press could be eviscerated.' " *Pell* v. *Procunier,* 417 U. S. 817, 833.

Today the Court does not question the existence of this constitutional protection, but says only that it is not "convinced . . . that confidential sources will disappear and that the press will suppress news because of fears of warranted searches." *Ante,* at 566. This facile conclusion seems to me to ignore common experience. It requires no blind leap of faith to understand that a person who gives information to a journalist only on condition that his identity will not be revealed will be less likely to give that information if he knows that, despite the journalist's assurance, his identity may in fact be disclosed. And it cannot be denied that confidential information may be exposed to the eyes of police officers who execute a search warrant by rummaging through the files, cabinets, desks, and wastebaskets of a newsroom.[5] Since the indisputable effect of such searches will thus be to prevent a newsman from being able to promise confidentiality to his potential sources, it seems obvious to me that a journalist's

---

[3] See *Mills* v. *Alabama,* 384 U. S. 214, 219; *New York Times Co.* v. *Sullivan,* 376 U. S. 254, 269; *Grosjean* v. *American Press Co.,* 297 U. S. 233, 250.

[4] Recognizing the importance of this confidential relationship, at least 26 States have enacted so-called "shield laws" protecting reporters. Note, The Newsman's Privilege After *Branzburg:* The Case for a Federal Shield Law, 24 UCLA L. Rev. 160, 167 n. 41 (1976).

[5] In this case, the policemen executing the search warrant were concededly in a position to read confidential material unrelated to the object of their search; whether they in fact did so is disputed.

access to information, and thus the public's, will thereby be impaired.[6]

A search warrant allows police officers to ransack the files of a newspaper, reading each and every document until they have found the one named in the warrant,[7] while a subpoena would permit the newspaper itself to produce only the specific documents requested. A search, unlike a subpoena, will therefore lead to the needless exposure of confidential information completely unrelated to the purpose of the investigation. The knowledge that police officers can make an unannounced raid on a newsroom is thus bound to have a deterrent effect on the availability of confidential news sources. The end result, wholly inimical to the First Amendment, will be a diminishing flow of potentially important information to the public.

One need not rely on mere intuition to reach this conclusion. The record in this case includes affidavits not only from members of the staff of the Stanford Daily but also from many professional journalists and editors, attesting to precisely such personal experience.[8] Despite the Court's rejection of this

---

[6] This prospect of losing access to confidential sources may cause reporters to engage in "self-censorship," in order to avoid publicizing the fact that they may have confidential information. See *New York Times Co.* v. *Sullivan, supra,* at 279; *Smith* v. *California,* 361 U. S. 147, 154. Or journalists may destroy notes and photographs rather than save them for reference and use in future stories. Either of these indirect effects of police searches would further lessen the flow of news to the public.

[7] The Court says that "if the requirements of specificity and reasonableness are properly applied, policed, and observed" there will be no opportunity for the police to "rummage at large in newspaper files." *Ante,* at 566. But in order to find a particular document, no matter how specifically it is identified in the warrant, the police will have to search every place where it might be—including, presumably, every file in the office—and to examine each document they find to see if it is the correct one. I thus fail to see how the Fourth Amendment would provide an effective limit to these searches.

[8] According to these uncontradicted affidavits, when it becomes known that a newsman cannot guarantee confidentiality, potential sources of infor-

uncontroverted evidence, I believe it clearly establishes that unannounced police searches of newspaper offices will significantly burden the constitutionally protected function of the press to gather news and report it to the public.

## II

In *Branzburg* v. *Hayes, supra,* the more limited disclosure of a journalist's sources caused by compelling him to testify was held to be justified by the necessity of "pursuing and prosecuting those crimes reported to the press by informants and . . . thus deterring the commission of such crimes in the future." 408 U. S., at 695. The Court found that these important societal interests would be frustrated if a reporter were able to claim an absolute privilege for his confidential sources. In the present case, however, the respondents do not claim that any of the evidence sought was privileged from disclosure; they claim only that a subpoena would have served equally well to produce that evidence. Thus, we are not concerned with the principle, central to *Branzburg,* that " 'the public . . . has a right to every man's evidence,' " *id.,* at 688, but only with whether any significant societal interest would be impaired if the police were generally required to obtain evidence from the press by means of a subpoena rather than a search.

It is well to recall the actual circumstances of this litigation. The application for a warrant showed only that there was reason to believe that photographic evidence of assaults on the police would be found in the offices of the Stanford Daily. There was no emergency need to protect life or property by an

---

mation often become unavailable. Moreover, efforts are sometimes made, occasionally by force, to prevent reporters and photographers from covering newsworthy events, because of fear that the police will seize the newsman's notes or photographs as evidence. The affidavits of the members of the staff of the Stanford Daily give examples of how this very search produced such an impact on the Daily's own journalistic functions.

immediate search. The evidence sought was not contraband, but material obtained by the Daily in the normal exercise of its journalistic function. Neither the Daily nor any member of its staff was suspected of criminal activity. And there was no showing that the Daily would not respond to a subpoena commanding production of the photographs, or that for any other reason a subpoena could not be obtained. Surely, then, a subpoena *duces tecum* would have been just as effective as a police raid in obtaining the production of the material sought by the Santa Clara County District Attorney.

The District Court and the Court of Appeals clearly recognized that *if* the affidavits submitted with a search warrant application should demonstrate probable cause to believe that a subpoena would be impractical, the magistrate must have the authority to issue a warrant. In such a case, by definition, a subpoena would not be adequate to protect the relevant societal interest. But they held, and I agree, that a warrant should issue only after the magistrate has performed the careful "balanc[ing] of these vital constitutional and societal interests." *Branzburg* v. *Hayes, supra,* at 710 (POWELL, J., concurring).[9]

The decisions of this Court establish that a prior adversary judicial hearing is generally required to assess in advance any threatened invasion of First Amendment liberty.[10] A search by police officers affords no timely opportunity for such a

---

[9] The petitioners have argued here that in fact there was reason to believe that the Daily would not honor a subpoena. Regardless of the probative value of this information, it is irrelevant, since it was not before the magistrate when he issued the warrant. *Whiteley* v. *Warden,* 401 U. S. 560, 565 n. 8; *Spinelli* v. *United States,* 393 U. S. 410, 413 n. 3; *Aguilar* v. *Texas,* 378 U. S. 108, 109 n. 1; see *Johnson* v. *United States,* 333 U. S. 10, 13–14.

[10] *E. g., United States* v. *Thirty-seven Photographs,* 402 U. S. 363; *Carroll* v. *Princess Anne,* 393 U. S. 175; *Freedman* v. *Maryland,* 380 U. S. 51. Cf. *Roaden* v. *Kentucky,* 413 U. S. 496; *A Quantity of Books* v. *Kansas,* 378 U. S. 205; *Marcus* v. *Search Warrant,* 367 U. S. 717.

hearing, since a search warrant is ordinarily issued *ex parte* upon the affidavit of a policeman or prosecutor. There is no opportunity to challenge the necessity for the search until after it has occurred and the constitutional protection of the newspaper has been irretrievably invaded.

On the other hand, a subpoena would allow a newspaper, through a motion to quash, an opportunity for an adversary hearing with respect to the production of any material which a prosecutor might think is in its possession. This very principle was emphasized in the *Branzburg* case:

> "[I]f the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement, he will have access to the court on a motion to quash and an appropriate protective order may be entered." 408 U. S., at 710 (POWELL, J., concurring).

See also *id.*, at 707–708 (opinion of Court). If, in the present litigation, the Stanford Daily had been served with a subpoena, it would have had an opportunity to demonstrate to the court what the police ultimately found to be true—that the evidence sought did not exist. The legitimate needs of government thus would have been served without infringing the freedom of the press.

### III

Perhaps as a matter of abstract policy a newspaper office should receive no more protection from unannounced police searches than, say, the office of a doctor or the office of a bank. But we are here to uphold a Constitution. And our Constitution does not explicitly protect the practice of medicine or the business of banking from all abridgment by government. It does explicitly protect the freedom of the press.

For these reasons I would affirm the judgment of the Court of Appeals.

Mr. Justice Stevens, dissenting.

The novel problem presented by this case is an outgrowth of the profound change in Fourth Amendment law that occurred in 1967, when *Warden* v. *Hayden,* 387 U. S. 294, was decided. The question is what kind of "probable cause" must be established in order to obtain a warrant to conduct an unannounced search for documentary evidence in the private files of a person not suspected of involvement in any criminal activity. The Court holds that a reasonable belief that the files contain relevant evidence is a sufficient justification. This holding rests on a misconstruction of history and of the Fourth Amendment's purposely broad language.

The Amendment contains two Clauses, one protecting "persons, houses, papers, and effects, against unreasonable searches and seizures," the other regulating the issuance of warrants: "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." When these words were written, the procedures of the Warrant Clause were not the primary protection against oppressive searches. It is unlikely that the authors expected private papers ever to be among the "things" that could be seized with a warrant, for only a few years earlier, in 1765, Lord Camden had delivered his famous opinion denying that any magistrate had power to authorize the seizure of private papers.[1] Because all such

[1] "Papers are the owner's goods and chattels: they are his dearest property; and are so far from enduring a seizure, that they will hardly bear an inspection; and though the eye cannot by the laws of England be guilty of a trespass, yet where private papers are removed and carried away, the secret nature of those goods will be an aggravation of the trespass, and demand more considerable damages in that respect. Where is the written law that gives any magistrate such a power? I can safely answer, there is none; and therefore it is too much for us without such authority

seizures were considered unreasonable, the Warrant Clause was not framed to protect against them.

Nonetheless, the authors of the Clause used words that were adequate for situations not expressly contemplated at the time. As Mr. Justice Black noted, the Amendment does not "attempt to describe with precision what was meant by its words 'probable cause'"; the words of the Amendment are deliberately "imprecise and flexible." [2] And MR. JUSTICE STEWART, when confronted with the problem of applying the probable-cause standard in an unprecedented situation, observed that "[t]he standard of reasonableness embodied in the Fourth Amendment demands that the showing of justification match the degree of intrusion." [3] Today, for the first time, the Court has an opportunity to consider the kind of showing that is necessary to justify the vastly expanded "degree of intrusion" upon privacy that is authorized by the opinion in *Warden* v. *Hayden, supra.*

In the pre-*Hayden* era warrants were used to search for contraband,[4] weapons, and plunder, but not for "mere evi-

---

to pronounce a practice legal, which would be subversive of all the comforts of society." *Entick* v. *Carrington*, 19 How. St. Tr. 1029, 1066 (1765).

[2] "Obviously, those who wrote this Fourth Amendment knew from experience that searches and seizures were too valuable to law enforcement to prohibit them entirely, but also knew at the same time that while searches or seizures must not be stopped, they should be slowed down, and warrants should be issued only after studied caution. This accounts for use of the imprecise and flexible term, 'unreasonable,' the key word permeating this whole Amendment. Also it is noticeable that this Amendment contains no appropriate language, as does the Fifth, to forbid the use and introduction of search and seizure evidence even though secured 'unreasonably.' Nor does this Fourth Amendment attempt to describe with precision what was meant by its words, 'probable cause'; nor by whom the 'Oath or affirmation' should be taken; nor what it need contain." *Berger* v. *New York*, 388 U. S. 41, 75 (Black, J., dissenting).

[3] *Id.*, at 69 (STEWART, J., concurring in result).

[4] It was stated in 1967 that about 95% of the search warrants obtained by the office of the District Attorney for New York County were for the

dence." [5]  The practical effect of the rule prohibiting the issuance of warrants to search for mere evidence was to narrowly limit not only the category of objects, but also the category of persons and the character of the privacy interests that might be affected by an unannounced police search.

Just as the witnesses who participate in an investigation or a trial far outnumber the defendants, the persons who possess evidence that may help to identify an offender, or explain an aspect of a criminal transaction, far outnumber those who have custody of weapons or plunder.  Countless law-abiding citizens—doctors, lawyers, merchants, customers, bystanders— may have documents in their possession that relate to an ongoing criminal investigation.  The consequences of subjecting this large category of persons to unannounced police searches are extremely serious.  The *ex parte* warrant procedure enables the prosecutor to obtain access to privileged documents that could not be examined if advance notice gave the custodian an opportunity to object.[6]  The search for the documents described in a warrant may involve the inspection

---

purpose of seizing narcotics and arresting the possessors.  See T. Taylor, Two Studies in Constitutional Interpretation 48, and n. 85 (1969).

[5] Until 1967, when *Warden* v. *Hayden* was decided, our cases interpreting the Fourth Amendment had drawn a " 'distinction between merely evidentiary materials, on the one hand, which may not be seized either under the authority of a search warrant or during the course of a search incident to arrest, and on the other hand, those objects which may validly be seized including the instrumentalities and means by which a crime is committed, the fruits of crime such as stolen property, weapons by which escape of the person arrested might be effected, and property the possession of which is a crime.' "  See *Warden* v. *Hayden,* 387 U. S., at 295–296, quoting from *Harris* v. *United States,* 331 U. S. 145, 154.

[6] The suggestion that, instead of setting standards, we should rely on the good judgment of the magistrate to prevent abuse represents an abdication of the responsibilities this Court previously accepted in carefully supervising the performance of the magistrate's warrant-issuing function.  See *Aguilar* v. *Texas,* 378 U. S. 108, 111.

of files containing other private matter.[7]   The dramatic character of a sudden search may cause an entirely unjustified injury to the reputation of the persons searched.[8]

---

[7] "There are three considerations which support the conclusion that private papers are central to the concerns of the fourth amendment and which suggest that, in accord with the amendment's privacy rationale, private papers should occupy a type of preferred position. The first consideration is the very personal, private nature of such papers. This rationale has been cogently articulated on a number of occasions. Private papers have been said to be 'little more than an extension of [the owner's] person,' their seizure 'a particularly abrasive infringement of privacy,' and their protection 'impelled by the moral and symbolic need to recognize and defend the private aspect of personality.' In this sense, every governmental procurement of private papers, regardless of how it is accomplished, is uniquely intrusive. In addition to the nature of the papers themselves, a second reason for according them strict protection concerns the nature of the search for private papers. The fundamental evil at which the fourth amendment was directed was the sweeping, exploratory search conducted pursuant to a general warrant. A search involving private papers, it has been noted, invariably partakes of a similar generality, for 'even a search for a specific, identified paper may involve the same rude intrusion [of an exploratory search] if the quest for it leads to an examination of all of a man's private papers.' Thus, both their contents and the inherently intrusive nature of a search for them militates toward the position that private papers are deserving of the fullest possible fourth amendment protection. Finally, not only is a search involving private papers highly intrusive in fourth amendment terms, but the nature of the papers themselves may implicate the policies of other constitutional protections. In addition to the 'intimate' relation with fifth amendment values, the obtaining of private papers by the government touches upon the first amendment and the generalized right of privacy." McKenna, The Constitutional Protection of Private Papers: The Role of a Hierarchical Fourth Amendment, 53 Ind. L. J. 55, 68–69 (1977–1978) (footnotes omitted).

[8] "Whether the search be for rubbish or narcotics, both innocent and guilty will suffer the loss of the proprietary right of privacy. The search for evidence of crime, however, threatens the innocent with an injury not recognized in the cases. That is the damage to reputation resulting from an overt manifestation of official suspicion of crime. Connected with loss of reputation, standing, or credit may be humiliation and other mental suffering. The interests here at stake are the same which are recognized in

Of greatest importance, however, is the question whether the offensive intrusion on the privacy of the ordinary citizen is justified by the law enforcement interest it is intended to vindicate. Possession of contraband or the proceeds or tools of crime gives rise to two inferences: that the custodian is involved in the criminal activity, and that, if given notice of an intended search, he will conceal or destroy what is being sought. The probability of criminal culpability justifies the invasion of his privacy; the need to accomplish the law enforcement purpose of the search justifies acting without advance notice and by force, if necessary. By satisfying the probable-cause standard appropriate for weapons or plunder, the police effectively demonstrate that no less intrusive method of investigation will succeed.

Mere possession of documentary evidence, however, is much less likely to demonstrate that the custodian is guilty of any wrongdoing or that he will not honor a subpoena or informal request to produce it. In the pre-*Hayden* era, evidence of that kind was routinely obtained by procedures that presumed that the custodian would respect his obligation to obey subpoenas and to cooperate in the investigation of crime. These procedures had a constitutional dimension. For the innocent citizen's interest in the privacy of his papers and possessions is an aspect of liberty protected by the Due Process Clause of the Fourteenth Amendment. Notice and an opportunity to object to the deprivation of the citizen's liberty are, therefore, the constitutionally mandated general rule.[9] An

---

the common law actions for defamation and malicious prosecution. Indeed, the loss of reputation and the humiliation resulting from the search of one's home for evidence of a heinous crime may greatly exceed the injury caused by an ill-grounded prosecution for a minor offense." Comment, Search and Seizure in the Supreme Court: Shadows on the Fourth Amendment, 28 U. Chi. L. Rev. 664, 701 (1961) (footnotes omitted).

[9] Only with great reluctance has this Court approved the seizure even of refrigerators or washing machines without notice and a prior adversary hearing; in doing so, the Court has relied on the distinction between loss

exception to that rule can only be justified by strict compliance with the Fourth Amendment. That Amendment flatly prohibits the issuance of any warrant unless justified by probable cause.

A showing of probable cause that was adequate to justify the issuance of a warrant to search for stolen goods in the 18th century does not automatically satisfy the new dimensions of the Fourth Amendment in the post-*Hayden* era.[10] In *Hayden* itself, the Court recognized that the meaning of probable cause should be reconsidered in the light of the new authority it conferred on the police.[11] The only conceivable justification for an unannounced search of an innocent citizen is the fear that, if notice were given, he would conceal or destroy the object of the search. Probable cause to believe that the

---

of property, which can often be easily compensated, and loss of less tangible but more precious rights: " '[w]here only property rights are involved, mere postponement of the judicial enquiry is not a denial of due process.' " *Mitchell* v. *W. T. Grant Co.*, 416 U. S. 600, 611, quoting from *Phillips* v. *Commissioner*, 283 U. S. 589, 596–597. See also *Michigan* v. *Tyler, ante,* at 514 (opinion of STEVENS, J.).

[10] Even before *Hayden* had repudiated the mere-evidence rule, scholars had recognized that such a change in the scope of the prosecutor's search authority would require a fresh examination of the probable-cause requirement. It was noted that the personal character of some evidentiary documents would "justify stringent limitation, if not total prohibition, of their seizure by exercise of official authority." Taylor, *supra,* n. 4, at 66. It is ironic that the Court today should adopt a rigid interpretation of the Warrant Clause to uphold this search when the Court was prepared only a few years ago to rely on the flexibility of the Clause to create an entirely new warrant in order to preserve the government's power to conduct unannounced inspections of citizens' homes and businesses. See *Camara* v. *Municipal Court,* 387 U. S. 523, 534–535, and 538.

[11] "There must, of course, be a nexus—automatically provided in the case of fruits, instrumentalities or contraband—between the item to be seized and criminal behavior. Thus in the case of 'mere evidence,' probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction. In so doing, consideration of police purposes will be required." 387 U. S., at 307.

custodian is a criminal, or that he holds a criminal's weapons, spoils, or the like, justifies that fear,[12] and therefore such a showing complies with the Clause. But if nothing said under oath in the warrant application demonstrates the need for an unannounced search by force, the probable-cause requirement is not satisfied. In the absence of some other showing of reasonableness,[13] the ensuing search violates the Fourth Amendment.

In this case, the warrant application set forth no facts suggesting that respondents were involved in any wrongdoing or would destroy the desired evidence if given notice of what the police desired. I would therefore hold that the warrant did not comply with the Warrant Clause and that the search was unreasonable within the meaning of the first Clause of the Fourth Amendment.

I respectfully dissent.

---

[12] "The danger is all too obvious that a criminal will destroy or hide evidence or fruits of his crime if given any prior notice." *Fuentes* v. *Shevin*, 407 U. S. 67, 93–94, n. 30.

[13] Cf. *Marshall* v. *Barlow's, Inc., ante,* at 336–339, and nn. 9–11 (STEVENS, J., dissenting).