UNITED STATES of America,
Plaintiff,

v.

Philip PETERSON, Thomas Graham, Jim Kelly, Lisa Sanchez Graham, Martha Peterson, Jacki Kelly, Richard Doty, Logan Farr, Ted Folk, Jerry Jennings, Dexter Lott, Dan Murphy, Deryn Riggs, Manuel Sanchez, and Ron Zorich Defendants.

No. CRIM. A. 98–CR–402.

United States District Court,
D. Colorado.

July 10, 2000.

John Henry Schlie, John Henry Schlie & Barry A. Schwartz, PC, Denver, CO, for Philip Peterson.

Richard N. Stuckey, Richard N. Stuckey, P.C., Denver, CO, for Thomas Graham.

Stephen M. Wheeler, Stephen Wheeler, Atty at Law, Evergreen, Peter Schild, Peter Schild Law Office, Boulder, CO, for Jim Kelly.

John Andrew Chanin, Isaacson, Rosenbaum, Woods & Levy, P.C., Denver, CO, for Lisa Sanchez Graham.

Philip W. Ogden, Philip Ogden, Atty at Law, Colorado Springs, CO, for Martha Peterson.

Mitchell Baker, Mitchell Baker, Atty at Law, Denver, for Jacki Kelly (6), defendants.

Eugene Scott Baroway, Baroway, Porter & Thomas, Englewood, CO, for Richard Doty.

David Barry Savitz, David B. Savitz, Atty at Law, Denver, CO, for Logan Farr.

Kirkland Leonard Brush, Fort Collins, CO, for Jerry Jennings.

Ann Phillips Kaufman, Ann P. Kaufman, P.C., Colorado Springs, CO, for Dexter Lott.

Thomas G. Martin, Thomas G. Martin, Attorney, PC, Colorado Springs, CO, for Dan Murphy.

Craig B. Shaffer, Moye, Giles, O'Keefe, Vermeire & Gorrell, Terry Jo Epstein, Dufford & Brown, P.C., Denver, CO, for Deryn Riggs.

Elisa Julie Moran, Elisa J. Moran, Atty at Law, Denver, CO, for Manuel Sanchez.

Daniel N. Recht, Daniel N. Recht, PC, Denver, for Ron Zorich (15), defendants.

Joseph Mackey, III, Assistant U.S. Atty's Offfice Criminal Division, Denver, CO, for U.S.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

BABCOCK, Chief Judge.

Defendant Thomas Graham ("Graham") moves to suppress business records, items, and documents seized pursuit to search warrant. Defendants Philip Peterson ("Peterson"), James Kelly ("Kelly"), and Logan Farr ("Farr") joined the motion. Oral argument and an evidentiary hearing was held on June 27, 2000. Based on the motions, responses, counsels' arguments, and evidence presented, I deny the motion.

### I. Background

On October 31, 1995 a search and seizure warrant was issued for the offices of American Exchange Group, Inc. ("AEG"). The warrant was executed by Federal Bureau of Investigation agents at AEG's Longmont, Colorado office on November 1, 1995. On October 22, 1998 an indictment was returned charging fifteen AEG employees with various counts of mail fraud, wire fraud, and aiding and abetting in violation of 18 U.S.C. §§ 1341, 1343 & 2. The indictment alleges that AEG solicited owners of time share vacation properties throughout the United States via mail and telephone. Owners were allegedly told by AEG employees that in exchange for a certain sum of money, AEG would hold meetings for prospective buyers and sell the properties in a short amount of time. Owners allegedly sent money via United States mail or Federal Express to AEG, in the form of checks or cash. Despite their promises, AEG did not sell these properties. Peterson, Graham, and Kelly were charged as "principals" in the scheme to defraud, while the remainder of the defendants were charged as "telemarketers" in the scheme.

Defendants argue that all items seized pursuant to the search warrant should be suppressed because: (1) the warrant lacked probable cause; (2) the warrant violates the particularity requirements as to matter to be searched for and seized; and (3) the warrant and search were overbroad. The government argues otherwise, and argues that the FBI agents relied on a facially valid warrant, curing any deficiency under *Leon*.

### II. Findings of Fact

All parties to the motion with the exception of Mr. Farr took part in an evidentiary hearing on June 27, 2000. Therefore, Mr. Farr is not bound by this order. Based on that hearing, I enter the following findings of fact.

In July of 1994 FBI Special Agent Mahon ("SA Mahon") received a tip from Margaret Chancellor. Ms. Chanchelor worked at AEG as a telemarketer. She informed SA Mahon that she believed false statements were being made to potential AEG customers regarding the ability of AEG to find buyers for properties, the existence of computers for checking properties, and the existence of a buying division at AEG. She informed SA Mahon that she believed these statements were in direct contravention of the AEG employee manual, which forbade telemarketers from telling customers falsities.

In approximately August of 1994, SA Mahon was contacted by Paul De John. Mr. De John was a telemarketer at AEG. He, too, reported that he believed false statements were being made to AEG customers regarding the existence of buyers for the properties, that customers were told "we're checking the computer now" for buyers when in fact there were neither buyers nor computers, and representations to customers that their properties were " 'A' rated" when there was no rating system. Mr. De John gave SA Mahon a sales script and a training tape recorded at a July 1994 sales meeting run by Mr. Peterson. The statements on the tape caused SA Mahon to conclude that Mr. Peterson was instructing telemarketers to make false statements to customers.

SA Mahon also interviewed Kay Nichols, a bookkeeper at AEG, and Ginnie Gannon, a receptionist/ secretary at AEG. They corroborated the information from Ms. Chancellor and Mr. De John. He then contacted the Boulder County District Attorney's Office and the Colorado Attorney General's Office. Both had received voluminous complaints regarding AEG. SA Mahon then had FBI agents interview possible victims. He had 11 or 12 of these victims consensually record telephone conversations with 17 AEG employees between February of 1995 and September of 1995. These calls revealed promises by AEG that properties would be sold quickly, buyers existed and wanted properties similar to the seller's property, properties would be sold through face-to-face meetings, the seller's property was 'A' rated, and it was impossible that the property would not sell. None of these seller's properties were sold.

Sellers were also told that PassKey Holidays, Inc., ("PKH") was responsible for recruiting potential buyers and selling the properties listed with AEG through face-to-face meetings. In October of 1995 SA Mahon had 4 undercover FBI agents attend a promotional talk at PKH's main office at the Denver Tech Center. At these PKH promotions, agents learned that PKH was selling memberships in a package travel company, not time share properties. Although agents represented that they were interested in buying time shares, PKH employees told agents that PKH didn't sell time shares and suggested that they contact its "sister company," AEG. An FBI agent contacted AEG posing as a potential buyer. She was not referred to PKH, but was told she could work through Ms. Peterson at AEG.

SA Mahon determined that AEG was listed with the Colorado Attorney General's Office as Eagle Rise Marketing ("ERM") d/b/a American Enterprise Group. The front door of AEG listed both AEG and PKH. AEG was listed as the subscriber of PKH's telephone number. SA Mahon also discovered that AEG was advertising in national newspapers.

Based on this information SA Mahon determined that AEG customers were relying on AEG promises that AEG had current buyers available and that buyers were recruited through face-to-face sales meetings. He determined these statements were false. SA Mahon then prepared a 39 page affidavit for a search warrant ("Affidavit"), and Application for the warrant ("Application"), as well as the warrant itself. He contacted SA Roberts of the Telemarketing Task Force at the San Diego FBI Office. SA Roberts confirmed that the items specified in the search warrant were those likely to be found in a boiler room telemarketing operation. SA Mahon also checked with Ms. Nichols, who reported seeing all of the items listed on the warrant at the AEG offices, with the exception of complaint letters.

SA Mahon presented the Affidavit, Application, and warrant to Assistant United States Attorney Mackey. These items were then presented to United States Magistrate Judge Borchers in the District Court for the District of Colorado. Attached to the Application and incorporated in it were: (1) Attachment A, a description of the location of the AEG offices in Longmont, Colorado; (2) Attachment B, a list of

items to be seized, labeled (a) through (t), with item (r) limiting the search to items pertaining to the time period between August 1994 and "the present" (October 31, 1995); and (3) Attachment C, a description of the alleged fraud and a list of the United States Code sections alleged to be violated. The Affidavit did not discuss the ability or efforts of AEG to find buyers, an audio training tape, or the October 1995 visit by agents to PKH. The Affidavit did list in great detail the interviews with victims and the taped telephone conversations with AEG employees.

On October 31, 1995 Magistrate Judge Borchers made a finding of probable cause and signed the warrant. Attachments A and B were physically attached to the warrant and incorporated by reference in it. Attachment C was neither attached nor incorporated. Nowhere in the warrant was the applicable statute listed or described. SA Mahon testified that the warrant went through FBI and U.S. Attorney's Office review before going to the Magistrate Judge and that the failure to incorporate Attachment C or the Affidavit into the warrant was an oversight. The warrant was signed and then ordered sealed by Magistrate Judge Borchers.

On October 31, 1995 a meeting was held with all FBI agents scheduled to participate in the search. They were informed of the logistics of the operation and were required to read copies of the Affidavit, Attachments A through C, and the warrant itself. All were given an opportunity to ask questions about them.

On the morning of November 1, 1995 the warrant was executed at the Longmont, Colorado AEG offices. The offices were secured, a floor plan was sketched, and offices and their contents were labeled on the floor plan by letter. The offices were then searched. Employees were detained and asked to provide their names, social security numbers, and dates of birth. Each employee was checked for outstanding warrants and given a chance to talk with FBI agents. Some accepted, some declined, and one was arrested on an outstanding warrant. At some point during the search AEG's lawyer arrived. He was given access to the site and the employees. He informed employees that they were not required to speak with the FBI.

During the course of the search SA Mahon supervised and was available for questions, as was his second in command, SA Helena Dugo (formerly SA Krajewski). SA Dugo had copies of the Affidavit, all Attachments, and the warrant on site. The majority of agents asked questions at some point during the almost eight hour search regarding the scope of the warrant. All questions were answered with reference to those documents. At some point during the search additional agents were brought in to assist. They, too, were required to read the Affidavit, all three Attachments, and the warrant. AUSA Mackey was contacted at least once by telephone to assist in determining the parameters of the warrant.

Items taken pursuant to the warrant included the file server and one backup tape of computer data, items with PKH information on them if they also appeared connected with AEG, and files with customer information that fell within the applicable dates regardless of whether the entire file fell into those dates. Computer systems were seized by SA Jeffrey Diehl and SA Casson, with consultation with the AEG systems analyst. They, too, reviewed the Affidavit, Application, Attachments, and warrant. They made recommendations regarding what computer items should be seized. Those recommendations were either accepted, rejected, or modified by SA Mahon based on the parameters of the warrant. AEG's computer and data systems were left largely intact by the search. Representative samples were taken of offer letters, solicitation postcards, and returned solicitation postcards. Items not taken included the majority of the computers, the majority of the phone system, one complete backup tape of the file server, personal employee records including Mr. Peterson's bank rec-

ords, and employee tax refund checks. Copies of the later were made.

During the search agents contacted Larry Hubbard, whose offices were in the AEG office. He represented to agents that he was with Colorado Data Systems, was an independent contractor of AEG, and was not subject to the search. Mr. Hubbard's lawyer was present for this conversation. Agents agreed that the Colorado Data Systems office was not subject to the warrant. Hubbard then consented to a search of his office and gave agents samples of information from a marketing program he was working on for AEG.

At the conclusion of the search, photographs were taken of the searched areas, all ninety inventory sheets were checked by both SAs Mahon and Dugo, and copies of those sheets were given to Lisa Sanchez Graham, a principal of AEG. Because the warrant and attachments were sealed by order of the Magistrate Judge, copies were not left on site. The following day AEG bank accounts were seized pursuant to a grand jury order. However, AEG opened for business on November 2, 1995.

### III. Conclusions of Law

Defendants argue that: (1) the warrant lacked information regarding AEG's buying efforts and with that information there would have been no probable cause; (2) the warrant and supporting documentation violate the particularity requirement as Attachment C was absent from the warrant itself; and (3) the warrant and search were overbroad.

### A. Probable Cause

■ To be valid, a search warrant must be based on probable cause. Probable cause exists when there are reasonable grounds to believe that the items sought to be seized are the fruits or instrumentalities of a crime and that the items will be found in the place to be searched. *See, e.g., Zurcher v. Stanford Daily*, 436 U.S. 547, 556–57, n. 6, 98 S.Ct. 1970, 56 L.Ed.2d 525 (1978). Defendants do not allege that the Affidavit on which the warrant was

based was facially insufficient for the Magistrate Judge's finding of probable cause. I agree that as written it contains an ample probable cause showing. They do, however, argue that had the Magistrate Judge known of attempts by AEG to find buyers for their listed properties, he would not have found probable cause. They state, equivocally, that this is not a *Franks* argument, *see Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), but cite no supporting cases for this proposition. I believe that this is in essence a *Franks* argument, but is not born out by the facts.

■ In *Franks v. Delaware*, the Supreme Court held that it is a violation of the Fourth Amendment for an arrest warrant affiant to "knowingly and intentionally, or with reckless disregard for the truth," include false statements in the affidavit. 438 U.S. 154, 155, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). The Tenth Circuit has extended this rule "to material omissions, as well as affirmative falsehoods." *Stewart v. Donges*, 915 F.2d 572, 582 (10th Cir.1990); *see also United States v. Kennedy*, 131 F.3d 1371, 1375 (10th Cir.1997). Under *Franks* and *Stewart*, a defendant must show (1) that the affiant knowingly or recklessly either included affirmatively false statements or omitted material facts, and (2) that the affidavit, with its necessary corrections, would not support probable cause. *See Franks*, 438 U.S. at 155–56, 98 S.Ct. 2674; *Stewart*, 915 F.2d at 582–83. Where information has been omitted from an affidavit, a determination of probable cause is made "by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant." *Stewart*, 915 F.2d at 582 n. 13. Additionally, a material omission negates the possibility that an otherwise invalid warrant will be spared from the exclusionary rule by the good faith exception in *United States v. Leon*. An officer can "have no reasonable grounds for believing that [a] warrant was properly

issued" "[i]f the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *United States v. Leon,* 468 U.S. 897, 923, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

Here, however, neither prong of the *Franks/Stewart* test is met. Defendants failed to show either that there were material misstatements or omissions in the Affidavit, or even if there were that such omissions negate probable cause. .

### 1. Material Omissions

Defendants failed to prove that material information was available to SA Mahon that was knowingly or recklessly omitted from the Affidavit. SA Mahon admitted on cross-examination that he did not mention certain facts in the warrant. He did not mention:

(1) that PKH handed out a flyer to customers at its travel membership meetings stating that those people interested in buying time shares should contact AEG; (2) the existence of Larry Hubbard or the Colorado Data Systems office; (3) that AEG was advertising in national newspapers; (4) a 1994 training tape; (5) that a previous tip by Ms. Chancellor regarding a possible bank robbery suspect did not pan out; and (6) FBI visits to the AEG offices in October of 1995.

As to points (1) and (2), Defendants were unable to establish that SA Mahon knew about the flyer or Larry Hubbard prior to writing the Affidavit. Point (4) is also not helpful, as Defendants did not establish any exculpatory information existed on the tape. To the contrary, Defendants have themselves complained in other motions of the inflammatory nature of the training tape. *See* Motions to Sever. As to point (5), Ms. Chancellor's robbery tip is immaterial. Her information in this case was independently corroborated by the FBI, and was unrelated to the earlier tip.

■ Therefore, of the omitted information, arguably SA Mahon could have been expected to inform the Magistrate Judge that that AEG was advertising in national newspapers, and that FBI agents visited the AEG offices in October of 1995 when they were told that they could work through Ms. Peterson to buy a time share. However, these facts were not misrepresented, nor was their omission material. Other information in the Affidavit alludes to the newspaper ads, *see* Affidavit at 12, 30, and alleges that AEG used those ads solely to deflect allegations of fraud without any intent to actually engage buyers. *See* Affidavit at 12. As for the FBI visits to the AEG offices, the only possibly exculpatory information gathered was that the agent could go through Ms. Peterson to buy a time share. However, this information was disclosed in the Affidavit. *See* Affidavit at 37. The Affidavit also states that SA Mahon went to the AEG offices in October of 1995. It is unclear from the elicited testimony what other exculpatory evidence could lay in the October 1995 visits.

### 2. Negation of Probable Cause

Even, if I were to find that these omissions were material, Defendants would still fail the *Franks/Stewart* test as they failed to show that had these omissions been included in the Affidavit they would have negated probable cause. The Affidavit outlines with specificity the fraud scheme, including allegations that ERM was doing business as AEG. *See* Affidavit at 4–7. It outlines more than thirty complaints received by various government agencies regarding AEG and the similarities in those allegations. It alleges that AEG completely failed to perform its guarantee to sell the properties. *See* Affidavit at 4–7. It then describes interviews with former employees. The employees detail events that led them to suspect fraudulent business dealings, items they believed indicated the fraud (including script sheets, post-cards, Federal Express packages) and involvement in the fraud by Philip Peterson. *See* Affidavit 7–16. The bulk of the Affidavit describes interviews with victims. The

victims describe the representations made by AEG employees (sometimes by name of employee), guarantees by AEG to sell property quickly, requests by AEG for money, and instructions regarding how to send money to AEG through the mails or by Federal Express. Some victims taped their conversations with AEG·at the request of law enforcement, some sent money, and some sent no money and had no further dealings with AEG. One complained repeatedly and received a refund. *See* Affidavit 16–38. The Affidavit then describes AEG offices and their location. Finally, it indicates that Attachment B has been reviewed by a FBI Special Agent assigned to the Telemarketing Task Force investigating fraudulent telemarketing operations for verification that each item listed is generally found in such operations. Read in its entirety, even with possible omissions included, the Affidavit clearly provides reasonable grounds to believe that the items sought to be seized were the fruits or instrumentalities of mail fraud, wire fraud, and aiding and abetting these crimes and that the items would be found in the Longmont AEG offices.

*B. Particularity requirement*

Defendants next argue that the warrant violates the particularity requirement of the Fourth Amendment. As an adjunct to this argument, Defendants contend the warrant and search were overly broad.

The Fourth Amendment to the United States Constitution requires that warrants "particularly describ[e] ... the persons or things to be seized." This particularity requirement prevents a "general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire,* 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), *overruled on other grounds, Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112. It also forbids "general searches ... and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Stanford v. Texas,* 379 U.S. 476, 485, 85 S.Ct. 506, 13 L.Ed.2d 431 (1965) (citations and quotations omitted); *See also Andresen v. Maryland,* 427 U.S. 463, 480, 96 S.Ct. 2737, 49 L.Ed.2d 627 (1976); *United States v. Medlin,* 842 F.2d 1194, 1199 (10th Cir.1988); *Voss v. Bergsgaard,* 774 F.2d 402, 404 (10th Cir.1985). "The particularity requirement [also] ensures that a search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause." *Voss,* 774 F.2d at 404. A companion doctrine to the particularity requirement requires the warrant not be overbroad and must identify the fruits and instrumentalities of the alleged crime. *See United States v. Harris,* 903 F.2d 770, 775 (10th Cir.1990). However, "[t]echnical requirements of elaborate specificity once exacted under common law pleading have no proper place in this area." *United States v. Ventresca,* 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965). "Where a warrant authorized the seizure of particularly described records relevant to a specific crime and all of an organization's records, in fact, fall into that category, they may all be seized." *Voss,* 774 F.2d at 406. Even a warrant that describes the items to be seized in broad or generic terms may be valid when the description is as "specific as the circumstances and the nature of the activity under investigation permit." *Hargus,* 128 F.3d at 1362–63, (citations and internal quotations omitted). If law enforcement officers grossly exceed the scope of a search warrant in seizing property, the particularity requirement is undermined and a valid warrant is transformed into a general warrant "thereby requiring suppression of all evidence seized under that warrant." *United States v. Medlin,* 842 F.2d 1194, 1199 (10th Cir. 1988).

Defendants first argue that the warrant fails the particularity requirement because it incorporates by reference Attachment A, a description of the offices to be searched, and Attachment B, a list of the items to be seized, but fails to specifically incorporate Attachment C, a description of the alleged

fraud. All three Attachments were included in the Affidavit and Application for search warrant. Defendants argue that this was a generalized search under *Voss*, and the omission of Attachment C therefore violates *United States v. Leary*, 846 F.2d 592 (10th Cir.1988). The government responds that the warrant was sufficiently particular, citing *United States v. Finnigin*, 113 F.3d 1182, 1186–87 (10th Cir.1997) and *United States v. Hargus*, 128 F.3d 1358, 1362–63 (10th Cir.1997). These cases both found that the warrant at issue was sufficiently particular to "allow the executing officers to distinguish between items that may and may not be seized." *Hargus* 128 F.3d at 1362–63, (citing *Finnigin*, 113 F.3d at 1187, and *Leary*, 846 F.2d at 602).

*Voss* concerned three IRS warrants to search a company suspected of conducting financial transactions on behalf of its clients in a manner designed to avoid detection by the IRS. The warrants authorized the seizure of:

> "all books, records or documents relating to the following: NCBE/NCE customer accounts; financial transactions; financial services; the purchase, sale, or storage of precious metals; employees; and marketing and promotions. They further authorized the seizure of books, literature and tapes advocating nonpayment of federal income taxes; publications of tax protestor organizations; and literature relating to communications between persons conspiring to defraud the IRS, or to conceal such fraud."

The District Court found the warrants were so pervasive as to be invalid, as they gave "carte blanche for government agents to take anything that they saw, whether it was nailed down or otherwise, and, indeed, as best I can find from the returns and the pleadings, that's precisely what did happen." *Voss v. Bergsgaard* 774 F.2d 402, 404 (10th Cir.1985) (citations omitted). The Tenth Circuit affirmed because the warrant was bounded only by reference to the federal conspiracy statute, 18 U.S.C. § 371. The court found that the government could rummage through all files,

"seeking any information pertaining to any federal crime. Even to describe the warrant as limited to evidence relating to federal crimes is an interpretation generous to the government." *Voss*, 774 F.2d at 405. The warrant was similarly executed in a broad manner, with agents seizing copies of the Internal Revenue Code, the Federal Rules of Criminal and Civil Procedure, and The Federalist Papers. The Tenth Circuit held that there was insufficient evidence to show the target company was pervaded by fraud at every level, and therefore the warrant could not be saved on those grounds. *Voss*, 774 F.2d at 406.

*Leary* concerned an investigation into a single purchase and attempted exportation of a Micro-tel receiver to the People's Republic of China via six companies in Hong Kong. *United States v. Leary*, 846 F.2d 592, 594 (10th Cir.1988). Based on an affidavit alleging violations of the Arms Export Control Act and the Export Administration Act, a warrant was issued to search defendant's offices and seize:

> Correspondence, Telex messages, contracts, invoices, purchase orders, shipping documents, payment records, export documents, packing slips, technical data, recorded notations, and other records and communications relating to the purchase, sale and illegal exportation of materials in violation of the Arms Export Control Act ... and the Export Administration Act of 1979....

The Court found this warrant to be constitutionally overbroad because it contained only two limitations. First, the documents seized had to fall into a long list of business records typical of the documents kept by an export company. Second, the documents had to relate to the "purchase, sale and illegal exportation of materials in violation of the federal export laws." *Id.* at 600.

The *Leary* court mentioned with approval several limiting factors which, if included in the warrant before it, would have rendered the warrant constitutional. These factors, relevant to the warrant in

this case, include: 1) limiting the seizure of documents to those which concern the crime(s) under investigation; 2) limiting seizure of documents to a specific period of time relating to the suspected crime(s); and 3) describing the criminal activities themselves rather than simply referring to the statute believed to have been violated.

The court went on to say that an Affidavit may cure an overbroad warrant, but only where the Affidavit and search warrant can reasonably be said to constitute one document. Two requirements must be met. First, the Affidavit and search warrant must be physically connected, and second the search warrant must "expressly refer to the Affidavit and incorporate it by reference using suitable words of reference." *Leary*, 846 F.2d at 603.

 Both *Voss* and *Leary* are distinguishable from this case in several respects. First, unlike those two cases, this was not a general warrant allowing seizure of all company records in their entirety. Rather, the warrant specifies that the following information may be taken:

(a) customer files, folders, or any other customer records.

(b) Letters of complaint or other correspondence.

(c) Telephone records including but not limited to: 800–831–3262, 800–277–3741; 303–684–9092, and 303–290–6476.

(d) Records of receipts of mailings, whether by United State Postal Service, Federal Express, or other delivery type services.

(e) Personnel and/ or pay records.

(f) Bank, credit union or other financial institution statements; canceled checks or drafts, check ledgers, check books and any documents relating to the financial business of AEG, PKH and ERM.

(g) Cash, personnel checks, money orders, cashier's checks, or any other negotiable instruments payable to or belonging to AEG, PKH, and ERM.

(h) Business licenses, Public Service receipts or any other documents which establish the identity of the owners, principles [sic], agents and/ or establishes the dominion and control of such persons over the business of AEG, PKH, and ERM.

(i) Scripts and/or sales pitch sheets preprinted or hand written.

(j) Lead source material, including the names, addresses and telephone numbers of prospective customers from purchased lead lists, subscriber lists, and business reply cards.

(k) Sales order, invoices, bills of sale and sale logs.

(*l*) Commission schedules.

(m) Sales, procedure, and policy manuals.

(n) Calendars and diaries.

(*o*) Personnel files for owners, managers, and employees, past and present.

(p) General journal, general ledger, accounts receivable and payable ledgers or records, sales journals, purchases journals, reflecting company business, to include documentation for entries therein.

(q) Computer and related equipment, and operating manuals, floppy discs, printed computer reports, software packages, and any related electronic devices which are capable of analyzing, creating, displaying, converting, or transmitting electronic or magnetic computer impulses or data.

(r) Any other documents or items which reflect the nature and/ or operation of the businesses as they relate to the crimes specified in this Affidavit, from August, 1994, to the present.

(s) Identification paper and documents, legitimate or false, for persons associated with AEG, PKH, and/or ERM, including but not limited to: Thomas C. Graham, Jim Kelly, Elisa G. Sanchez, Phillip [sic] S. Peterson, and telephone solicitors.

(t) Titles or other motor vehicle identification documentation.

Second, and also unlike *Voss* and *Leary*, the warrant here was executed in a manner consistent with Attachment C. All agents read the Affidavit and Attachments

in their entirety before executing the search. The Affidavits and Attachments were available at the scene and were constantly referenced in order to ensure that seizures remained with their parameters. A review of the inventory shows that the items seized fell within the parameters of the warrant.

Third, SA Dugo testified that agents viewed item (r), the time frame, as applying to all items seized. Therefore, no items were taken that fell outside of the specified time frame, with the exception of customer files. Those files, SA Dugo testified, were viewed as one piece of evidence. The agents made the decision to seize entire customer files if any one piece of evidence within that file fell into the time frame. She testified agents felt this was required in order to keep the evidence in its pristine state and prevent agents from dismembering files.

Additionally, the warrant shows those items the *Leary* court specifically stated would save an otherwise invalid warrant: (1) the seizure of documents was limited to those which concerned the crime(s) under investigation; (2) the seizure of documents was limited to a specific period of time relating to the suspected crime(s); and (3) the Affidavit and Attachment C were used during the search and described the criminal activities themselves rather than simply referring to the statute believed to have been violated.

Defendants argue that warrants also serve a notice purpose and that purpose was failed because AEG did not receive a copy of the warrant and its attachments. It is not contested that the contents of the warrant serve as notice to the searched as well as guidance for searchers. Although AEG and its principals were not provided with the warrant and its attachments, this does not vitiate the otherwise valid search. In this case the warrant was under seal. Defendants point to no impropriety in sealing the warrant and its attachments. In due course and when appropriate, the notice purpose was served by unsealing these documents. Finally, no prejudice has been alleged or shown.

Defendants next argue that the warrant and supporting documentation is not particular enough in that: (1) it fails to consider whether the companies had the ability to perform the legitimate business it purported to perform; (2) it fails to limit the items which may be seized; (3) it fails to distinguish between personal and business items; (4) it fails to distinguish between various business entities; (5) it fails to distinguish between telemarketing and other business activity; and (6) it fails to distinguish between fraudulent and legitimate telemarketing activity. They argue that records were seized relating to Pass-Key Holidays, Inc. (PKH) and Eagle Rise Marketing (ERM) without supporting facts in the Affidavit showing a link between these companies and the fraud, that documents relating to legitimate business activities were seized, and that records of AEG's effort to launch a buying division with the cooperation of the North American Recreational Properties Association (NARPA) (the Larry Hubbard documents) were seized, prematurely ending both these efforts and a possible defense to the charges of fraud.

The government responds that the Affidavits and Attachments were sufficiently particular, because: (1) the companies' *ability* to perform the legitimate business they purported to perform is irrelevant, as the Affidavit clearly indicates that they were not in fact performing a legitimate business; (2) the warrant specifically limited items to be seized and the seizure itself was done with due regard for the warrant's boundaries; (3) personal items were not seized; (4) the Affidavit shows that ERM was a shell corporation doing business as AEG and while certain items related to PKH were seized, PKH's office at the Denver Tech Center was not searched; (5) it is not necessary to determine the knowledge of each employee before searching for items in that employee's work space related to the fraud and AEG

was inherently fraudulent and illegal; and (6) there was no evidence of legitimate telemarketing, and no records relating to legitimate telemarketing were seized.

The government's arguments are born out both by the Affidavit supporting the warrant and the testimony of the agents at the hearing. As explained in part A, *supra*, the Affidavit outlines with specificity the pervasive fraud scheme, including allegations that ERM was doing business as AEG. *See* Affidavit at 4–7. It outlines thirty complaints received by various government agencies regarding AEG, and the similarities in those allegations. *See* Affidavit at 4–7. It details interviews with former employees, including events that led them to suspect fraudulent business dealings, items they believed indicated the fraud, and involvement in the fraud by Philip Peterson. *See* Affidavit 7–16. It describes interviews with victims, including the details of the promises made in return for money.

It is also clear that the warrant was carefully executed. Agents drew a map of the AEG offices, inventoried the contents of those offices, interviewed employees, and checked each item against the warrant before it was seized. Throughout the search the agents were in contact with SA Mahon, SA Dugo, and AUSA Mackey by telephone, who assisted them in determining the boundaries of the warrant with reference to the Affidavit and all three Attachments. A number of documents outside the parameters of the warrant were not taken, personal items were not taken, and except as legitimately noted, items outside the time frame of the fraud specified in the warrant were not taken. A review of the inventory supports these assertions. A detailed office diagram is included, and although the inventory is ninety pages long there are indications that some inventoried items were either not seized or were returned to employees.

The government concedes that records relating to NARPA were seized. However, uncontroverted and credible testimony made clear that those documents were seized with the consent of Larry Hubbard in the presence of his attorney.

I therefore find and conclude that this was not a generalized search as defined by *Voss* and *Leary* and comports with the Fourth Amendment in that the warrant was supported by probable cause, met constitutional particularity requirements, and was not grossly overbroad in its execution.

### C. Good Faith

 Even if I were to find that the warrant was not sufficiently particular, this search would be saved by the good faith exception articulated in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984); and *Massachusetts v. Sheppard*, 468 U.S. 981, 988, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984). Under those two cases, any failure in particularity can be cured through objective good faith reliance on a facially valid warrant.

The government argues *Leon* and *Sheppard* would apply because the FBI relied on a facially valid warrant and that reliance was objectively reasonable. Defendants seem to concede that the *Leon* test has been met, but argue that the "real purpose of this warrant was merely to close down AEG," and, therefore, this is "one of those 'unusual' cases where suppression of evidence is appropriate to deter government misconduct ...." (citing *Leary*, at 609).

The record is void of evidence of government misconduct. SA Mahon testified credibly that any incorporation mistakes in the warrant were inadvertent. The warrant went through regular review procedures in the FBI office and the U.S. Attorney's Office. It was further reviewed by a neutral Magistrate Judge. Any mistakes made in the wording of the warrant were fully countered by the manner in which the warrant was executed. Agents acted as if they were bounded by the Affidavit and Attachment C, regardless of whether it was incorporated in the warrant. Nor is there any evidence that the purpose of the search was to close down AEG. To the

contrary, SA Diehl testified that agents purposely left complete backup copies of AEG's file server. Were AEG to buy, lease, or borrow a hard drive they would have complete use of their computer system. Their phone system was left intact. Uncontroverted photographs taken at the completion of the search show offices that remained relatively organized, with large amounts of paper documents and a phone system. Indeed, AEG opened for business the next morning. Suppressing items seized pursuant to the warrant would serve no valid purpose, as there was no untoward government behavior to deter.

Accordingly, it is ORDERED that:

(1) the motion to suppress business records, items, and documents seized pursuit to search warrant is DENIED.