RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 15a0030p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

No. 14-3526

*v.*

JEFFREY BURNEY,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Southern District of Ohio at Dayton.
No. 3:12-cr-00151-2—Thomas M. Rose, District Judge.

Decided and Filed: February 19, 2015

Before: NORRIS, ROGERS, WHITE, Circuit Judges.

───────────────

**COUNSEL**

**ON BRIEF:** Kevin M. Schad, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellant. Brent G. Tabacchi, UNITED STATES ATTORNEY'S OFFICE, Dayton, Ohio, for Appellee.

ROGERS, J., delivered the opinion of the court in which NORRIS, J., joined. WHITE, J. (pp. 9–13), delivered a separate dissenting opinion.

───────────────

**OPINION**

───────────────

ROGERS, Circuit Judge. When police officers executed a search warrant at the 2044 Litchfield Avenue residence in Dayton, Ohio, they found Jeffrey Burney, a number of handguns, and several ounces of crack cocaine inside. Convicted of possessing crack cocaine with intent to distribute it, Burney appeals on the sole ground that the warrant underlying the search was not

supported by probable cause. The affidavit supporting the warrant provided several strong indications that the residence was used as a stash house by a drug trafficking operation, and that the house had been unoccupied for more than eight months when Burney, a repeat drug convict, moved in a few weeks before officers obtained the warrant. Because the warrant affidavit presented sufficient evidence tying the property, if not Burney himself, to an ongoing drug trafficking and money laundering operation, and because that evidence, taken as a whole, was sufficiently reliable, the district court properly denied Burney's motion to suppress.

From October 2011 through July 2012, a drug task force in Montgomery County, Ohio investigated Dion Ross and several of his associates for operating a drug trafficking and money laundering ring in the Dayton metro area. In the course of its investigation, the task force collected information from reliable confidential informants, made controlled buys of cocaine from Ross and his associates, and conducted extensive surveillance of properties the task force suspected Ross was using as "stash houses"—places to store bulk quantities of drugs, firearms, and cash associated with his drug trafficking and money laundering operation.

An analysis of financial records and public documents led the task force to conclude that Djuna Brown-Jennings played an integral role in Ross's criminal enterprise, laundering drug proceeds for Ross and fraudulently hiding his assets—including multiple homes and cars—in her name. Despite the relatively modest income she reported on her state tax returns, Brown-Jennings held title to 16 vehicles, including multiple newer, high-end cars. Between 2010 and 2012, she applied for temporary license tags for nine additional vehicles, including several cars titled to a business Ross owned. County records also showed that Brown-Jennings owned and received utility bills for multiple homes in the Dayton metro area. Based on the disparity between her reported income and the assets she controlled, task force members concluded that Brown-Jennings was merely a nominee owner of those properties, and that she held title to them as a "front" for Ross.

Officers' suspicions about the link between Ross and Brown-Jennings were buttressed by evidence that Ross used property—such as cell phones, cars, and homes—registered to Brown-Jennings in trafficking cocaine. For instance, during a series of controlled buys from Ross and his associates, a confidential informant repeatedly contacted Ross on a cell phone registered to

Brown-Jennings.  On at least one such occasion, Ross drove a car registered to Brown-Jennings to a drug deal with the confidential informant.

One of the properties to which Brown-Jennings held title was located at 2044 Litchfield Avenue ("the Litchfield property").  In the course of its investigation, the task force came to suspect that the Litchfield property was one of Ross's stash houses.  This suspicion was supported by several pieces of evidence.  First and foremost, Brown-Jennings held title to the property and the utilities for it were in her name, even though she did not live there.  Indeed, for months during the task force's investigation, the Litchfield property appeared to be totally unoccupied.  Additionally, on October 19, 2011, after a confidential informant arranged a cocaine buy with Ross, task force officers saw Ross enter and promptly exit the Litchfield residence, from which he drove to the meet location and delivered more than 100 grams of cocaine to the confidential informant.  Following the October 19 controlled buy, officers conducted spot checks of the Litchfield property and repeatedly observed Ross's cars parked in the driveway.

During June 2012, officers noticed that a truck registered to Jeffrey Burney was sometimes parked at the Litchfield property.  Searches of several law enforcement databases showed that Burney had recently listed the Litchfield property as his residence on certain legal documents.  Those same searches also revealed that Burney had been convicted of five drug offenses in the past decade and was even then on parole for one such offense.

On June 30, 2012, after more than eight months' investigation, task force officers presented a judge of the Montgomery County Court of Common Pleas with a 17-page affidavit for a warrant to search the Litchfield property.  The affidavit detailed the task force's reasons for believing Ross was using the property as a stash house.  After reviewing the affidavit, which included all of the information set out above, *see United States v. Burney*, No. 3:12-cr-151, doc. # 74, the judge issued the warrant.[1]  A few days later, police executed the search warrant at the

---

[1]The main portion of the affidavit dealing specifically with the Litchfield property provides as follows:

    1.   The Affiant found that Djuna Brown is the listed owner of this property and the [utilities] account at this location is in her name (see paragraph K).  Through the Affiant's investigation, the Affiant has learned that Dion Ross often uses assets in Djuna Brown's name, including vehicles, houses, and cell phones.  (see paragraphs R, V, and SS section 4)

Litchfield property.  Inside the residence, they discovered Burney, multiple firearms, and several ounces of cocaine.

Burney was indicted on three counts, including being a felon in possession of a firearm and possessing crack cocaine with intent to distribute it.  Before trial, he moved to suppress evidence of the handguns and drugs officers found in their search of the Litchfield property, contending that the underlying warrant was not based on probable cause.  The district court denied the motion, prompting Burney to enter a conditional guilty plea to the charge of possessing crack cocaine with intent to distribute it.  The district court sentenced Burney to 60 months of imprisonment and 60 months of supervised release.  Burney now appeals, challenging the court's denial of his motion to suppress.

Whether an affidavit contains evidence sufficient to establish probable cause depends on whether it establishes "a nexus between the place to be searched and the evidence to be sought." *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc).  In this case, the requisite nexus was supplied principally by the Litchfield property's persistent connections to

---

2. During a controlled narcotics purchase from Dion Ross in October of 2011, the Affiant observed Dion Ross leave 2044 Litchfield Avenue and drive directly to the buy location, where Ross delivered an amount of powder cocaine to [a confidential informant].  (see paragraph V)

3. Since October of 2011, the Affiant has conducted surveillance of 2044 Litchfield Avenue several times, at various times of day and night.  On several occasions, the Affiant has observed vehicles that he knew Dion Ross to be driving parked in the driveway of the residence.  For several months, it did not appear to the Affiant that anyone was residing at 2044 Litchfield Avenue, as the house appeared to be vacant from the street.

4. In June of 2012, the Affiant and other members of the RANGE Task Force observed a red 2003 Ford truck bearing Ohio registration FOM9952 parked in the driveway of 2044 Litchfield Avenue several times, most recently on June 30th, 2012.

5. Upon checking the registration through [a law enforcement database], the Affiant found that the vehicle was registered to one Jeffery L. Burney B/M DOB/[redacted], SOC [redacted], with an address of 2044 Litchfield Avenue.  Upon checking Burney through various law enforcement databases, the Affiant found that Burney is currently on parole through the State of Ohio for Possession of Drugs (crack) and Felonious Assault.  The Affiant also found that Burney has at least four previous convictions for Possession of Crack in Montgomery County [case numbers omitted].

6. The Affiant requests the court's permission to search 2044 Litchfield Avenue in the City of Dayton as the Affiant believes that this is a possible "stash" house of Dion Ross.

*United States v. Burney*, No. 3:12-cr-151, doc. # 74, at 10.

Ross and Brown-Jennings, who police had reason to suspect were cooperating in a drug trafficking and money laundering operation. After more than eight months of investigation, the task force concluded that Ross operated several stash houses in the Dayton metro area, and the task force had ample basis for believing the Litchfield property was one of them. For one thing, Brown-Jennings held title to the Litchfield property and the utilities for it were in her name. Police knew Brown-Jennings served as a front for Ross's drug trafficking and money laundering operation, purchasing and holding assets for Ross—including homes and vehicles—in her name. Thus, Brown-Jennings' ownership of the Litchfield property strongly suggested a connection between the property and Ross's illicit operation.

Police had also repeatedly spotted Ross and his vehicles at the Litchfield property, both during and after the October 19 controlled buy at which Ross drove directly from the Litchfield property to the scene of the exchange. Ross's frequent presence at the property was all the more probative of unlawful activity because title to the property was not in his name and, for months during the investigation, the property had no known tenant that Ross might have been visiting. The only occupant ever identified in the affidavit was Burney, who apparently moved in just a few weeks before the search warrant issued (and, perhaps not coincidentally, on the eve of Ross's receiving a sizable shipment of drugs, as described in the affidavit at paragraphs PP–RR). Not only did Burney have several drug convictions to his name, he was on parole for one such conviction when he began listing the Litchfield property as his residence. His presence at the Litchfield property would only further support the conclusion that the property was affiliated with illicit drug trafficking.

The above-recited facts from the affidavit—considered together, as they must be, *see United States v. Jackson*, 470 F.3d 299, 306 (6th Cir. 2006)—constitute probable cause to search the Litchfield property. That is particularly true in light of both the "great deference" we owe the magistrate judge's probable cause assessment, *United States v. Greene*, 250 F.3d 471, 478 (6th Cir. 2001), and the Supreme Court's recent statement that, "Probable cause . . . is not a high bar: It requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Kaley v. United States*, 134 S. Ct. 1090, 1103 (2014). The facts recited in the warrant affidavit established just that type of "fair probability": the Litchfield property was

owned by Ross's principal "front"; Ross had repeatedly visited the property, including once just before a controlled buy with a confidential informant; the property had sat suspiciously unoccupied for months on end; and the new tenant at the property had a lengthy history of drug convictions.

None of Burney's arguments undermines the conclusion that probable cause existed here. It is true that Burney was the sole occupant of the otherwise vacant Litchfield property, that the affidavit did not link him to Ross, and that the affidavit contained no evidence that Burney was involved in Ross's operation. But the pertinent question in this case is not whether officers had cause to search the Litchfield property *because* it was Burney's residence, nor whether they had cause to suspect Burney of working with Ross. "The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought." *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978). Thus, in determining whether the warrant affidavit supplied probable cause, the only relevant question is whether the affidavit gave a reasonable basis for believing there were drugs or evidence of drug trafficking at the Litchfield property. Ross's and Brown-Jennings' many connections to the property, together with its having sat vacant for months and only recently having been occupied by a man with multiple drug convictions, made it reasonable to conclude that the property was one of Ross's stash houses, so that there would be evidence of drug trafficking within it. This is so regardless of whether police had any evidence tying Burney to Ross. The fact that Burney was only mentioned in one paragraph of the affidavit is not determinative—it was the Litchfield property, not Burney, that was the subject of the affidavit.

The evidence linking the Litchfield property to Ross's drug trafficking operation was also not "stale." Burney points out that the last time police saw Ross in person at the Litchfield residence was eight months before the warrant was obtained. In fact, police had, on more recent occasions, seen Ross's vehicles parked at the Litchfield residence. That they did not observe Ross in the flesh on those occasions does not mean they could not reasonably conclude he was inside the Litchfield property in each instance.

The bare fact that a piece of evidence is months old, moreover, does not automatically make it stale. Rather than imposing arbitrary, inflexible deadlines, the staleness inquiry turns on four practical, fact-dependent considerations:

> (1) the character of the crime (chance encounter in the night or regenerating conspiracy?), (2) the criminal (nomadic or entrenched?), (3) the thing to be seized (perishable and easily transferrable or of enduring utility to its holder?), and (4) the place to be searched (mere criminal forum or secure operational base?).

*United States v. Frechette*, 583 F.3d 374, 378 (6th Cir. 2009). In this case, all four of those considerations militate in favor of finding the relevant evidence sufficiently non-stale. First, the crime at issue—a large-scale drug trafficking and money laundering operation—is a regenerating, enduring criminal enterprise that bears no resemblance to a "chance encounter in the night." Second, the criminal under investigation—Ross—was firmly entrenched in the Dayton metro area. By its very nature, his drug trafficking operation, relying as it did on an established network of distributors and customers, was not the kind of nomadic or sporadic criminal enterprise likely to up-and-vanish under cover of darkness. Third, the evidence to be seized under the warrant was not perishable in the way that, for example, a few crack rocks are perishable. On the contrary, the evidence to be seized in this case included anything tending to show that the Litchfield property was being used as a stash house. Unlike evidence of drug possession, evidence that a residence is being used as a stash house is unlikely to be consumed or to disappear, precisely because that evidence—scales, weapons, safes, bagging materials, and the like—is not readily consumable and is "of enduring utility to its holder." Finally, a stash house is, by definition, a "secure operational base," rather than a "mere criminal forum." For all those reasons, evidence of Ross's use of the Litchfield property was not stale when it was presented as part of the warrant affidavit here at issue.

It is true that, in *United States v. Brooks*, 594 F.3d 488, 493 (6th Cir. 2010), we noted in dictum that, "Given the mobile and quickly consumable nature of narcotics, evidence of drug sales or purchases loses its freshness extremely quickly." But the affidavit in this case did not suggest that police sought evidence of specific drug sales or purchases at the Litchfield property. Instead, the thing to be seized in this case was evidence that the property was being used on an ongoing basis as part of a drug trafficking operation. That evidence, for the reasons set out

above, was much less likely to disappear than is evidence of drug sales, purchases, or possession. The language from *Brooks*—and other cases where police sought evidence of specific drug transactions or instances of possession—is therefore inapposite.

The evidence of Ross's use of the Litchfield property also did not become stale simply because Burney had apparently taken up residence at the property only a few weeks before the warrant issued. Brown-Jennings continued to hold title to the Litchfield property and receive utility bills for the property at the time the warrant issued. Thus, a key link between Ross's criminal enterprise and the Litchfield property remained in place throughout Burney's residency.

Furthermore, to find that Burney's residency erased all ties between the property and Ross's drug trafficking operation would require a court to ignore what the affidavit revealed about Burney. As the affidavit explained, officers knew that the Litchfield property's new resident had an extensive rap sheet, including five recent convictions for possessing crack cocaine, the very substance in which Ross trafficked. Indeed, when the warrant issued, Burney was still on parole for one such conviction. That Burney had begun claiming the Litchfield property as his residence sometime in June 2012 could not, then, as a matter of common sense, have done anything to reduce the likelihood of ongoing illicit drug activity inside the property. As the Supreme Court stated in *Illinois v. Gates*, 462 U.S. 213, 238 (1983), a magistrate judge's task when deciding whether to issue a warrant "is simply to make a practical, common-sense decision."

The warrant affidavit supplied probable cause to search the Litchfield property, so that the district court did not err in denying Burney's motion to suppress. Because the warrant was supported by probable cause, we need not address the parties' arguments concerning the good-faith exception to the warrant requirement from *United States v. Leon*, 468 U.S. 897 (1984), or Burney's status as a parolee.

The judgment of the district court is AFFIRMED.

_____

**DISSENT**

_____

HELENE N. WHITE, Circuit Judge.  I respectfully dissent.  The majority fails to appreciate the significance of Burney's moving into the Litchfield property and wrongly imputes Ross's alleged bad acts to Burney by relieving the Government of the obligation to show probable cause to believe that the property was still used as a "stash house" after Burney moved in.  I would reverse the denial of Burney's suppression motion and vacate his guilty plea.

**I.**

The affidavit dated June 30th, 2012, covered seventeen pages, pertained to seven residences, and was entirely premised on Ross's alleged criminal enterprise.  As the majority acknowledges, Burney was mentioned only one time, and only in relation to the Litchfield property.  The pertinent section of the affidavit consists of three statements regarding the Litchfield property:

> 3.  Since October of 2011, the Affiant has conducted surveillance of 2044 Litchfield Avenue several times, at various times of the day and night.  On several occasions, the Affiant has observed vehicles that he knew Dion Ross to be driving parked in the driveway of the residence.  For several months, it did not appear to the Affiant that anyone was residing at 2044 Litchfield Avenue, as the house appeared to be vacant from the street.

> 4.  In June of 2012, the Affiant and other members of the RANGE Task Force observed a red 2003 Ford truck bearing Ohio registration FOM9952 parked in the driveway of 2044 Litchfield Avenue several times, most recently on June 30th, 2012.

> 5.  Upon checking the registration through [a law enforcement database], the Affiant found that the vehicle was registered to [Burney] with an address of 2044 Litchfield Avenue.  Upon checking Burney through various law enforcement databases, the Affiant found that Burney is currently on parole through the State of Ohio for Possession of Drugs (crack) and Felonious Assault.  The Affiant also found that Burney has at least four previous convictions for Possession of Crack.

## II.

## A.

The affidavit is fraught with ambiguity, and the issuing magistrate should have demanded clarity before authorizing a search of Burney's home.  Nevertheless, the majority implies facts that are not supported by the record.  For example, a material ambiguity in the affidavit stems from Officer McCoy's statement that he saw vehicles associated with Ross at the property "several times" since October 2011.  It is impossible to know how many times "several" indicates, or when he saw these cars (*i.e.*, just prior to Burney moving in or only in November 2011).  Nevertheless, the majority concludes:  "Following the October 19th controlled buy, officers conducted spot checks of the Litchfield property and *repeatedly* observed Ross's cars parked in the driveway."  This gives the unsupported impression that Ross's cars were present at the Litchfield property as a matter of course in the months following October 2011.  Ambiguous as it may be, the affidavit suggests that the vehicles associated with Ross stopped appearing at the property some "several month" period prior to June 2012.  And, Officer McCoy's testimony confirms that the majority's conclusion is incorrect:  no vehicles were seen at the property for at least "several months" prior to June 2012.  Thus, at a minimum, several months went by where there was no indication that Ross or his associates were using the Litchfield property at all, much less as a "stash house."

This faulty inference matters; that the house appeared to be occupied and visited by Ross or his associates, then went through a "several month" period of being unoccupied and unvisited, and then was occupied again (by Burney) in June 2012 leads to the conclusion, or at minimum raises the very significant probability, absent evidence to the contrary, that drug activity Ross or his associates may have conducted at the house had ceased.

## B.

It is undisputed that Burney had a reasonable expectation of privacy in the Litchfield property.  Accordingly, the officers needed a properly supported warrant to search his home. *See, e.g.*, *Kentucky v. King*, 131 S. Ct. 1849, 1856 (2011).  For the warrant to be valid, the affidavit had to establish probable cause to believe that evidence of criminal activity would be

found at the property notwithstanding the officers' observations supporting that possession of the property had changed hands.  *See, e.g.*, *United States v. Hython*, 443 F.3d 480, 486 (6th Cir. 2006) ("Even had the affidavit stated that from time out of mind [the location under investigation] had been a notorious drug den, some recent information would be necessary to eliminate the possibility that a transfer in ownership or a cessation of illegal activity had not taken place.").

At bottom, the majority's decision hinges on Ross's *de facto* ownership of the Litchfield property through Brown-Jennings.  In explaining how the affidavit supported the search warrant, the majority states:  "First and foremost, Brown-Jennings held title to the property and the utilities for it were in her name, even though she did not live there."  But as the majority acknowledges, "The critical element in a reasonable search is *not that the owner of the property is suspected of crime* but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to which entry is sought."  *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978).  Had Burney not moved into the property, there would be no problem searching the property based on the observations in the warrant.  But, Burney's moving in and listing the property as his residence after it was unoccupied signaled a change of possession and control and, therefore, a more thorough review of the affidavit was required to ensure that Burney's constitutional rights were not violated.  *See Hython*, 443 F.3d at 486. Brown-Jennings's title to the Litchfield property would not support a search without some indication that she or Ross continued to have a connection to the premises other than mere title.

The majority necessarily assumes that Ross's use of the property continued despite Burney's moving in.  Without some indication that Ross's use of the Litchfield property continued after Burney moved in, there is no justification for treating the change of residence as insignificant.  *See id.*  As in *Hython*, given the length of time between the alleged criminal activity and the application for the search warrant, coupled with Burney's newly established residence at the property, "there is absolutely no way to begin measuring the continued existence of probable cause."  *Id.* (citing *United States v. Williams*, 480 F.2d 1204, 1205 (6th Cir. 1973)). This renders the warrant invalid.

The majority suggests that because the timing of Burney's arrival loosely coincided with an alleged imminent drug transaction orchestrated by Ross, it was more reasonable to search the Litchfield property. Burney moved into the Litchfield property in early-June 2012; the cocaine shipment that prompted the search was allegedly supposed to arrive in the Dayton area on June 30, 2012, and was not linked to a particular location (and certainly not the Litchfield property).[1] It cannot fairly be said that Burney's appearance at the property, nearly a month before an alleged cocaine shipment was scheduled to arrive at an unknown location somewhere in the Dayton metro area, established a "fair probability" that Burney had taken up residence to assist in the drug distribution, especially when there is nothing tying him to drug distribution, Ross's enterprise, or any other part of the conspiracy.

Because at the time the warrant was obtained Burney was the sole occupant of the Litchfield property and the affidavit offered no reason to believe that criminal activity was still afoot at the home, I would find the warrant invalid.

## C.

Burney must also show that the affidavit was so facially defective that no reasonable officer could have relied on it. Even if later held to be invalid, as a general matter, an officer may rely on a facially valid warrant, *United States v. Leon*, 468 U.S. 897, 920 (1984); but *Leon*'s good-faith exception does not apply if, *inter alia*, the officer's reliance on the warrant was not in good faith or objectively reasonable, *id.* at 923.

At the suppression hearing, Officer McCoy, who was both the affiant and on the team executing the warrant, testified that the confidential informants he had worked with "did not mention anything about Jeffrey Burney to [him]"; that he had not seen any activity at the house after October 2011 other than cars occasionally parked in the driveway; that he "didn't think

---

[1]In the proceedings below and in its brief on appeal, the Government makes clear that the search warrant was based on an impending shipment expected to arrive somewhere in Dayton on June 30, 2012: "Based on Ross's tacit representations that he soon expected to receive a shipment of drugs [on June 30, 2012], police conducted surveillance at several stash houses – including the Litchfield residence." According to the Government, "Given the timing of these events, a fair probability existed that Mr. Burney had arrived at a location Ross owned to assist in the distribution of *the impending shipment of cocaine*." Thus, it is clear that the affidavit's reference to a "large load of cocaine" that had been seized on June 24, 2012 was not the basis for obtaining the search warrant, and there is no other basis in the affidavit to support the majority's conclusion that Burney's continued presence at the Litchfield residence was premised on "Ross's receiving a sizeable shipment of drugs." The majority reads more into the affidavit than is warranted.

anybody was living" at the Litchfield property for a several month period; that he was aware Burney had claimed the Litchfield property as his home in early-June 2012, nearly a month before the search warrant was obtained; and that he had not observed Burney do anything illegal. Officer McCoy did not offer any basis to conclude that Burney was part of Ross's enterprise, that criminal activity had occurred at the Litchfield property after Ross's visit in October 2011, or that Burney was only using part of the home (meaning the remainder was still under Ross's control). Accordingly, Officer McCoy could not reasonably believe that he had probable cause to search the Litchfield property; thus, he could not rely on the warrant's facial validity and the *Leon* good-faith exception does not apply.

## III.

For these reasons, I would reverse the district court's suppression ruling and vacate Burney's guilty plea.