**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 18a0063n.06

No. 16-2366

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Feb 06, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Plaintiff-Appellee,** | ) | |
| | ) | **ON APPEAL** FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| WILLIE RILEY CURRY, | ) | DISTRICT OF MICHIGAN |
| | ) | |
| **Defendant-Appellant.** | ) | **OPINION** |
| | ) | |

**BEFORE: NORRIS, ROGERS, and DONALD, Circuit Judges.**

**ALAN E. NORRIS, Circuit Judge.** Defendant Willie Curry appeals his jury conviction for production of child pornography, sex trafficking of children, attempted sex trafficking of children, and possession of a firearm as a felon. He argues that the district court erred by admitting certain evidence and testimony; he also challenges his indictment. For the reasons that follow, we **affirm**.

**I.**

On August 3, 2013, three minor girls with the initials E.P. (age 15), E.C. (age 16), and O.H. (age 16) ran away from the group home where they were living in Mt. Pleasant, Michigan. The girls happened upon defendant as he was fishing nearby, and requested a ride to Grand Rapids, Michigan. The girls told defendant how old they were, and that they had run away from a group home. Defendant told the girls that Grand Rapids was too far, but he offered to give them a ride to Detroit the next day. The girls spent the night in Mt. Pleasant at the home of a friend of defendant's, where they met defendant's girlfriend, Tammy Pollard.

Defendant told the girls that if they would come to Detroit he would take care of them, promising money, phones, jobs, and drugs. The following day Pollard and defendant took the girls to their home on Warwick Street, in Detroit. Though defendant told the girls they would be cooking and cleaning, and could otherwise do what they want, once they arrived in Detroit he informed them they would be going on dates with men for money, and he would be their pimp. O.H. in particular was distressed by this and asked to go home, but defendant informed them that they were his until they turned eighteen. Defendant used his cell phone to take sexually explicit photos of the girls, which he sent by text message to entice potential customers to pay for sex with the girls.

Over the next several days, defendant physically and sexually assaulted all three girls and forced E.P. and E.C. to have sex with others for money. Defendant raped O.H. and tried unsuccessfully to force her to have sex with others. Detailed accounts of defendant's actions were proved at trial, but they are not germane to the appeal so we will not recount them here.

On August 15, 2013, O.H escaped from the house on Warwick Street through a bathroom window and made her way to a gas station, where a woman took her to meet her father. Her father then took O.H. to the Michigan State Police (MSP) to tell her story. With O.H. on the loose, defendant temporarily moved the other two girls to the home of Thomas Sweet, an acquaintance and apparently a narcotics customer of defendant's. The MSP went to defendant's home on Warwick Street the same day, but did not find E.C. or E.P. at the house. Sometime while the two girls stayed at Sweet's house, Sweet permitted E.P. to contact her mother using his cell phone.

On August 19, 2013, the Southeastern Michigan Crimes Against Children Task Force (SEMCAC), whose membership includes the Federal Bureau of Investigation, the MSP, and

other local law enforcement agencies, received information about the girls' being held against their will and forced into prostitution. The same day, law enforcement officers from SEMCAC interviewed Sweet, who confirmed that the two girls had stayed at his house for several days and had used his phone. Sweet confirmed that the girls were acquainted with defendant. SEMCAC members returned to the house on Warwick Street, where Pollard invited them into the house and confirmed that the girls had been living there. The SEMCAC members removed the girls and took them to the MSP station to be interviewed.

On October 23, 2013, a search warrant was executed at the Warwick Street house, where defendant and Pollard were arrested without incident. The search turned up a firearm and ammunition, two cellular telephones, a computer, two broom handles, and a mop handle. One of the broom handles was later identified as the one defendant used to beat one of the girls. Forensic identification of one of the telephones turned up fifteen deleted images and text messages offering the girls up for prostitution.

After a ten-day trial, the jury convicted defendant on all counts: three counts of Production of Child Pornography in violation of 18 U.S.C. §§ 2251(a) and 2251(e), one count of Conspiracy to Engage in Sex Trafficking of Children in violation of 18 U.S.C. §§ 1594(c) and 1591(a), two counts of Sex Trafficking of Children in violation of 18 U.S.C. §§ 1591(a) and 1591(b)(1), one count of Attempted Sex Trafficking of Children in violation of 18 U.S.C. §§ 1594(a), 1591(a), and 1591(b)(1), and one count of Felon in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(1).

**II.**

Defendant argues on appeal (1) that the district court erred by admitting the evidence discovered at the Warwick Street property because the warrant was issued without probable cause, (2) that his Sixth Amendment rights were violated when certain DNA-related testimony was admitted without an opportunity to cross-examine the technicians who performed relevant testing, and (3) that the indictment was facially defective, and the difference between the indictment and the jury instructions constituted a constructive amendment or prejudicial variance. We will address defendants claims in order.

*A.       Search Warrant Probable Cause*

The Fourth Amendment requires in most cases that law enforcement obtain a warrant, supported by probable cause, to protect individuals against unreasonable searches and seizures. U.S. Const. amend. IV. To establish probable cause, an affidavit must show a likelihood that items connected with criminal activity will be found in the place to be searched. *United States v. Abernathy*, 843 F.3d 243, 249 (6th Cir. 2016). Defendant claims that the warrant in this case was not supported by probable cause primarily because the information contained in the affidavit was stale. *See United States v. Perry*, 864 F.3d 412, 414 (6th Cir. 2017) ("'[S]tale information cannot be used in a probable cause determination.") (quoting *United States v. Frechette*, 583 F.3d 374, 377 (6th Cir. 2009)). The district court ruled that the warrant *was* supported by probable cause, and we review that determination de novo. *See United States v. Brown*, 828 F.3d 375, 381 (6th Cir. 2016) (citing *United States v. Brown*, 732 F.3d 569, 572 (6th Cir. 2013)).

When reviewing probable cause, we apply a four-factor test to determine whether information contained in a warrant application is stale: "(1) the character of the crime (chance encounter in the night or regenerating conspiracy?), (2) the criminal (nomadic or entrenched?),

(3) the thing to be seized (perishable and easily transferrable or of enduring utility to its holder?), and (4) the place to be searched (mere criminal forum of convenience or secure operational base?)." *Frechette*, 583 F.3d at 378. In cases involving narcotics, for instance, an affidavit has a very brief shelf life. *See, e.g.*, *United States v. Burney*, 778 F.3d 536, 541 (6th Cir. 2015) ("Given the mobile and quickly consumable nature of narcotics, evidence of drug sales or purchases loses its freshness extremely quickly.") (quoting *United States v. Brooks*, 594 F.3d 488, 493 (6th Cir. 2010)).

Here, however, defendant's contention that the information in the affidavit was stale does not present a close question. Two of the girls were recovered from defendant's residence on Warwick Street on August 19, 2013, and the warrant was signed by a magistrate judge sixty-four days later, on October 22, 2013. During that intervening time, law enforcement interviewed the girls, and, in addition to learning what had transpired, law enforcement learned that defendant used a cellphone to take pornographic photos of the girls, had a computer and firearm in the home, and that defendant used a broom handle to beat one of the girls. Law enforcement also discovered that defendant and his girlfriend Pollard were convicted felons and therefore they could not legally possess a firearm. Finally, law enforcement confirmed that defendant's cellphone had been in frequent contact with the cell tower closest to the Warwick Street address, and that his car recently had been seen in the driveway. The affidavit set out in detail the evidence of defendant's crimes, and sought authorization to search for computers, cell phones, firearms, and broom handles that may have been used to assault one of the girls.

Turning to the *Frechette* factors for determining staleness, the character of defendant's crimes—sex trafficking of children and production of child pornography—is not one of a chance encounter but rather that of an ongoing operation, interrupted in this case only by one girl's

5

escape and the rescue of the other two. As for factors two and four, the place to be searched was defendant's residence, where he was entrenched, and which also served as the "home base" of the criminal activity. Though the girls were sent away from the house to turn "tricks," they resided with defendant at the residence and that's where the child pornography was created. Finally, the things to be seized included one or more cellphones and computers from which law enforcement reasonably believed they would recover pornographic images of the girls and evidence of sex trafficking. Computer evidence has a particularly long life span; even after evidence is deleted by a user, it often can be recovered by law enforcement. *See, e.g.*, *Frechette*, 582 F.3d at 378-79 (finding affidavit describing sixteen-month-old evidence of electronic child pornography not stale). There was a nexus between defendant's residence and the things to be seized because, along with the cellphones and computers, it was reasonable to expect that the broom handle used to assault one of the girls, as well as the firearm that the girls had observed, would still be at defendant's residence. After a careful review of the record, we agree with the district court that all four *Frechette* factors support the conclusion that the information in the affidavit was not stale, and that it established probable cause.

B.      *DNA Evidence Testimony*

Defendant claims his Confrontation Clause rights were violated when the district court permitted testimony about DNA evidence without a sufficient opportunity to cross-examine the analysts who performed the tests. Because defendant did not object to the testimony at trial, we review for plain error. *United States v. Collins*, 799 F.3d 554, 576 (6th Cir. 2015). To prevail, defendant must show that admitting the testimony was an error that was clear and obvious, and that the error affected his substantial rights. *See United States v. Stewart*, 729 F.3d 517, 528-29 (6th Cir. 2013); Fed. R. Crim. P. 52(b). "[T]he plain error doctrine is to be used sparingly, only

in exceptional circumstances, and solely to avoid a miscarriage of justice." *Stewart*, 729 F.3d at 529 (quoting *United States v. Phillips*, 516 F.3d 479, 487 (6th Cir. 2008)).

Defendant objects to testimony by two government witnesses about DNA evidence offered to support testimony by one girl that defendant raped her. The first witness, Dereck Cutler, worked as a DNA analyst with Sorenson Forensics, a private laboratory hired by the MSP to test evidence, including rape kits. Cutler's testimony included background about the testing process and confirmed that Sorenson created a report, which it sent to the MSP providing a profile of DNA from the rape kit. Similarly, Catherine Maggert, an MSP DNA analyst, testified that the DNA profile provided by Sorenson was compared with samples in the FBI's CODIS database, and yielded a possible match. The comparison results prompted Maggert to request a fresh DNA sample from defendant and compare it to the DNA profile from the rape kit. It was a match.

Defendant asserts that his Confrontation Clause rights were violated by Cutler's testimony about the Sorenson report and Maggert's testimony about the CODIS match because the testing was done, in part, by other analysts, and those analysts were not available for cross-examination. Indeed, a laboratory report admitted as evidence without providing a defendant the opportunity to cross-examine the analyst who prepared the report violates the Confrontation Clause. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 321-24 (2009). And providing a substitute analyst who did not perform the test in question to testify about a laboratory report used as evidence is not sufficient to ameliorate Confrontation Clause concerns. *See Bullcoming v. New Mexico*, 564 U.S. 647, 661–62 (2011).

Defendant's Confrontation Clause objections fail under plain error review. To prevail on plain error review, defendant must show, among other things, that admission of the testimony

affected his substantial rights, *i.e.*, that it "affected the outcome of the district court proceedings." *United States v. Hayes*, 218 F.3d 615, 622 (6th Cir. 2000) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). Defendant cannot do so. First, he cannot show prejudice from Cutler's testimony about the Sorenson report. Cutler only testified that Sorenson received the rape kit from the MSP, produced an unknown male DNA profile from the materials in the rape kit, and then sent that DNA profile back to the MSP. Cutler said nothing about whose DNA might match the rape kit profile, because Sorenson never attempted to match the profile to anyone. Since Cutler's testimony established only that the DNA profile came from the rape kit materials, the testimony would only be prejudicial if Sorenson made a mistake in creating the profile. However, under the circumstances of this case, it is exceptionally unlikely that Sorenson made such an error. Sorenson did not receive a sample of defendant's DNA; rather, Sorenson received only the rape kit materials. Therefore, Sorenson could not have accidentally used a sample of defendant's DNA instead of the rape kit materials to create the profile. Under these circumstances, the odds are astronomical that Sorenson would have erroneously produced a DNA profile from the rape kit matching the prime suspect. Defendant thus cannot show that Cutler's testimony affected the outcome of the trial.

Nor can defendant show that Maggert's testimony about the CODIS match affected the outcome of his trial. This testimony was duplicative of, and corroborated by, Maggert's later testimony that she personally tested defendant's DNA against the rape kit profile and found a match. Defendant does not challenge the admission of this later testimony. Even if the CODIS match had been obtained incorrectly, this would do nothing to undermine the results of Maggert's independent test, which was strong evidence against defendant. Thus, admission of

the CODIS testimony did not affect the outcome of the trial, and its admission was not plain error.

### C.     *The Indictment*

Defendant asserts that counts five and six of the Superseding Indictment were facially invalid because they contained an incorrect mens rea standard. He bases this argument on the fact that the indictment charged that he "had a reasonable opportunity to observe" that the victims had not attained the age of eighteen, but the jury instructions required the jury to find instead that he "knew or recklessly disregarded" the fact that they were under eighteen. In the alternative, defendant claims that the divergence between the mens rea element as described in the indictment and the government proofs and jury instructions constituted an amendment or prejudicial variance: if defendant knew from the outset that the mens rea element in the jury instructions was going to be higher, his trial strategy could have included attacking that element.

Because the indictment was not challenged at trial, on appellate review the indictment is "construed liberally in favor of its sufficiency." *United States v. Bankston*, 820 F.3d 215, 229 (6th Cir. 2016) (quoting *United States v. Gatewood*, 173 F.3d 983, 986 (6th Cir. 1999)). Because it was also raised for the first time on appeal, whether there was an amendment or prejudicial variance is reviewed for plain error. *See United States v. Beasley*, 583 F.3d 384, 389 (6th Cir. 2009).

Counts five and six of the First Superseding Indictment were for Sex Trafficking of Children, in violation of 18 U.S.C. §§ 1591(a) and 1591(b). The applicable statutory structure provides alternative mens rea standards. The mens rea element in 18 U.S.C. § 1591(a) is "knowing, or . . . in reckless disregard of the fact . . . that the person has not attained the age of 18 years." However, 18 U.S.C. § 1591(c) provides that in prosecutions under § 1591(a) where

"the defendant had a reasonable opportunity to observe the [victim] . . . the Government need not prove that the defendant knew, or recklessly disregarded the fact, that the person had not attained the age of 18 years."

Viewing the whole statute, it is clear that the mens rea element found in the indictment correctly stated the lower mens rea standard found in § 1591(c). Arguably, the indictment should have cited that subsection. An error in citation, however, is not sufficient to render an indictment invalid. Fed. R. Crim. P. 7(c)(2) ("Unless the defendant was misled and thereby prejudiced, neither an error in a citation nor a citation's omission is a ground to dismiss the indictment or information or to reverse a conviction."); *see also United States v. West*, 562 F.2d 375, 379 (6th Cir. 1977) (finding indictment valid even where it cited the wrong statute). Defendant was not prejudiced here. The lower mens rea standard included in the indictment was correct, and defendant could have been convicted based on that standard.

For similar reasons, defendant cannot show that the government's decision to prove the higher mens rea, and to agree to jury instructions to that effect, constituted an amendment or prejudicial variance. It is not clear from the record why the government acquiesced to jury instructions that made defendant's conviction more difficult, but narrowing the grounds for conviction is permissible. *See United States v. Miller*, 471 U.S. 130, 136-44 (1985).[1] Perhaps if defendant had any credible argument that he did not know or recklessly disregard the ages of the victims, the government may have insisted on jury instructions that included the "reasonable opportunity to observe" language.

---

[1] Note that it may have been somewhat more problematic if the situation had been reversed, and the indictment required knowledge or reckless disregard of the victims' ages, but the jury was instructed that a reasonable opportunity to observe the victims was sufficient. *See, e.g.*, *United States v. Lockhart*, 844 F.3d 501, 515–16, n.3 (5th Cir. 2016) (holding that reducing the mens rea requirement from the indictment to the jury instructions *was* a constructive amendment, but it did not constitute plain error).

Such speculation is unnecessary. Though the disconnect between the indictment's mens rea language and statutory citation was sloppy on the part of the government, the indictment was easily sufficient for the crime charged. Similarly, the divergence from the indictment language to the jury instructions invited some confusion, but the divergence did not constitute a constructive amendment or prejudicial variance. Even if, for the sake of argument, increasing the mens rea requirement in the jury instructions did constitute an amendment or variance, defendant falls well short of showing that the claimed error was plain and obvious, and substantially affected his rights, as required under plain error review.

### III.

The judgment of the district court is **affirmed**.